818 F.2d 318
 43 Fair Empl.Prac.Cas. 1472,
43 Empl. Prac. Dec. P 37,274
Sandra K. BEATTY, Plaintiff-Appellant,
v.
CHESAPEAKE CENTER, INC.; Chesapeake Developmental Unit,
Inc.; Chesapeake Group Homes, Inc., Defendants-Appellees.
 No. 86-1176.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 3, 1987.
Decided May 8, 1987.
Rehearing En Banc Granted July 14, 1987.*
 
 Eileen McGinley Stein, Chevy Chase, Ind. (Leslye Orloff, Women's Legal Defense Fund, Washington, D.C., on brief), for plaintiff-appellant.
 Waller Staples Hairston (Henry, Hairston & Price, Easton, Md., on brief), for defendants-appellees.
 Before HALL and SPROUSE, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 K.K. HALL, Circuit Judge:
 
 
 1
 Sandra K. Beatty, plaintiff in an action alleging employment discrimination based on her pregnancy, appeals an order of the district court entering judgment after a bench trial in favor of defendants Chesapeake Center, Inc., Chesapeake Developmental Unit, Inc., and Chesapeake Group Homes, Inc. (collectively "the Center"). The district court determined that the defendants had articulated a valid non-pretextual justification for their decision to rescind an offer of employment to Beatty and, therefore, had not violated Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. Sec. 2000e et seq. Because we conclude that the defendants' proffered explanation for their employment decision is inherently incredible as a matter of law, we find the district court's determination clearly erroneous and reverse.
 
 I.
 
 2
 In 1983, Beatty sought employment with the Chesapeake Developmental Unit, Inc.[1] as an instructor of mentally retarded adults. She was eventually offered the position on December 2, 1983, after a personal interview with Mary Brown, the Unit's manager.
 
 
 3
 When Beatty arrived for her first day of work on January 16, 1984, Brown met her and inquired if she was wearing a maternity blouse. Beatty explained that she was pregnant but that she intended to continue working after giving birth and would need only a brief period of leave when the baby was born. When asked if this would cause any problem, Brown replied, "No, only staffing while you are out." Brown also asked Beatty if she had known she was pregnant at the time of her employment interview. Beatty responded that she had not known of her pregnancy at that time.
 
 
 4
 Brown then escorted Beatty into an adjoining room where the Center's orientation program was to take place. In connection with that program, Beatty was presented with an employment contract which she signed. One provision of the contract required that new employees "be willing to participate in an annual physical examination and tuberculin test."
 
 
 5
 At a subsequent stage in the orientation process, the schedule called for "Physical examination & T.B. (P.P.D.) documentation completion or arrangements made."[2] Beatty informed Brown that she had once tested positive for tuberculosis but no longer had the disease in any form. In support, Beatty produced a Charles County Health Department certificate dated October 4, 1981, which stated that she was "free of tuberculosis in a communicable stage." Beatty also presented a physician's letter dated November 4, 1982, indicating that she had undergone a negative tuberculin test on that date.
 
 
 6
 At this juncture, the substance of the communications between Beatty and Brown are in dispute. Beatty later testified that as she produced her medical records she stated that "its probably good that I'm certified because it probably wouldn't be healthy for me to have one at this time." Brown testified that Beatty had stated that "she would not want to take another TB test."
 
 
 7
 Despite the substantial similarity between the two accounts, the meaning allegedly attributed to Beatty's remarks was decidedly different. Beatty testified that her statement indicated no more than a general reluctance to undergo an unnecessary medical procedure while Brown contended that she understood the remarks to be an absolute refusal to take another skin test. Brown further testified that she believed state law required annual tests and that Beatty's documentation was outdated.
 
 
 8
 Brown then left the room with Beatty's documents and sought out the Center's Director, John Wright. According to her testimony, Brown informed Wright that there was a problem with a new employee inasmuch as the employee's T.B. test was outdated and she was unwilling to take another. Wright testified that he ordered Brown to halt the orientation process and to inform Beatty that there was a change in her status. Wright also instructed Brown to contact the relevant state agency to clarify the applicable regulations with regard to T.B. testing.
 
 
 9
 Brown returned to the orientation room and asked Beatty to come into her office. Beatty was then informed that the orientation process was being terminated as a result of her "change in status." Despite Beatty's repeated and increasingly emotional requests for some explanation for the sudden turn in events, Brown refused to answer any further questions. Beatty was required to leave, although Brown stated that she would be in touch with her within a week.
 
 
 10
 Brown testified that she then contacted Elmira LeGates, a nurse at the Talbot County Health Department, who informed her that a T.B. test taken before July 1, 1983, was not valid. In response to a hypothetical question allegedly posed by Brown, LeGates indicated that if a pregnant woman tested positive on the P.P.D., a follow-up x-ray would be potentially harmful. Brown did not, however, inquire whether the skin test itself would pose any health risk to a pregnant woman or whether a temporary waiver of the test was permitted.
 
 
 11
 Brown testified that after her conversation with LeGates she decided to hire another person for the position. An applicant named Sue Davis was contacted and offered the job, which she accepted. Brown then sent a letter to Beatty on January 20, 1984, in which she stated that her T.B. testing was outdated and that
 
 
 12
 In light of your stated position of not subjecting yourself to a tuberculin test at this time, we are unable to continue to process you as a new employee of Chesapeake Developmental Unit. At such time as you can satisfactorily complete the requirements, we will be happy to have you resubmit your application for employment.
 
 
 13
 It is undisputed that Beatty was never told of any problem with her T.B. documentation until she received Brown's letter.
 
 
 14
 Beatty replied in a letter dated January 23, 1984, in which she expressed distress that she had not been informed that a new T.B. test was necessary. She also stated that "I called my doctor today and she assures me that a T.B. test is completely safe now and so I will have one done as soon as I hear from you." When she received no response to this letter, Beatty telephoned Brown on January 25. In that conversation, she again maintained that she had never refused a request for a new T.B. test and that she was willing to take the test at any time. Finally, Beatty received a letter from Brown dated January 27, 1984, which stated that "the vacancy has been filled by someone else who could meet all the requirements."
 
 
 15
 After filing a charge of discrimination with the Equal Employment Opportunity Commission and receiving a notice of right to sue on January 4, 1985, Beatty instituted the instant civil action alleging that she was denied employment as a result of her pregnancy in violation of Title VII. The Center contended that it had rescinded the employment offer only because it honestly believed that Beatty would not take the P.P.D. test as required by state law. After a one-day bench trial, the district court held in favor of the Center and concluded that the decision to deny Beatty employment stemmed from a sincere misunderstanding rather than from intentional discrimination. In support of its conclusion, the court noted, inter alia, that Beatty had been allowed to sign a contract, that certain differences existed between her deposition and trial testimony with regard to what was said at the orientation, and that the Center had an unblemished record of granting maternity leave without objection.
 
 
 16
 This appeal followed.
 
 II.
 
 17
 On appeal, Beatty contends that the Center's proffered explanation for its employment decision is so inherently implausible that it can be construed only as a pretext for discrimination. Although we are mindful that the district court's contrary determination is an issue of fact that must be affirmed unless "clearly erroneous," Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), we, nevertheless, find appellant's argument persuasive.
 
 
 18
 It is undisputed that Beatty established a prima facie case of discrimination under the standards articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973): she was a member of a protected class;[3] she applied for a job for which she was qualified; despite her qualifications she was rejected; and the job she sought remained open. The burden of production, therefore, shifted to the Center to "articulate some legitimate, nondiscriminatory reason for the ... rejection." Id. While the burden of persuasion on the ultimate issue of discrimination remained on appellant throughout, that burden could be satisfied by one of two methods: "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (emphasis added).
 
 
 19
 The Center argues that its decision to deny employment to Beatty was a product of a sincere misunderstanding and that the district court's finding in its favor based upon an assessment of witness credibility cannot be clearly erroneous. We disagree. The unique opportunity to observe the demeanor of witnesses requires that the trier of fact's credibility determinations be accorded great deference. Anderson, 105 S.Ct. at 1512. Nevertheless, if the story advanced by a witness is "implausible on its face" when viewed "in light of the record in its entirety" Id., we are not barred from finding reversible error. See also Bishopp v. District of Columbia, 788 F.2d 781 (D.C.Cir.1986).
 
 
 20
 As an initial matter, we fail to see how Beatty's comments at the orientation session could be interpreted by any reasonable person as a refusal to take a required test. Our review of this record convinces us that any differences in Beatty's accounts of her statements at orientation, as noted by the district court, were insignificant minor word changes. At most, Beatty stated that she "would not want" to take any further tests, a rational position for a pregnant woman in light of her belief that she had already provided documentation adequate to meet the state requirements. We find it significant that Brown accepted Beatty's medical records without intimating in any fashion that they might be insufficient and that the orientation procedures were subsequently terminated without ever informing Beatty of any potential problem. Indeed, despite her strenuous efforts to obtain some explanation beyond her supposed "change in status," Beatty was clearly denied any opportunity to clarify the situation. It strains credulity to suggest the Center believed that Beatty would not comply with the state law when it deliberately avoided telling her that she was not in compliance.
 
 
 21
 We also note that the Center's subsequent discussion with Talbot County medical personnel regarding T.B. testing demonstrates that it was more interested in developing a justification for rejecting appellant than in solving any problem with her employment. Brown supposedly asked Elmira LeGates if an x-ray would be harmful to a pregnant woman, although the question posed by Beatty's employment involved only the skin test. Significantly, Brown did not ask whether alternative testing procedures were available or whether a temporary waiver of the skin test was possible. The latter omission is particularly striking in light of the Center's stipulation that on at least five occasions it had allowed employees to work for substantial periods of time without taking a skin test for tuberculosis.
 
 
 22
 We attach little weight to the fact that Beatty was allowed to sign an employment contract. The contract was signed as the first stage in the orientation process. Having already offered the position, the Center could not have withheld the contract at that juncture without clearly evidencing an intent to discriminate based on Beatty's pregnancy.
 
 
 23
 We also find the Center's past history of granting maternity leave to its existing employees to be of scant relevance in this appeal. This case involves a hiring decision. There is no evidence in the record that the Center ever knowingly hired a woman who was pregnant. Indeed, the Center was clearly unaware of Beatty's pregnancy when the job was offered. Furthermore, Brown's questioning at the orientation regarding when Beatty had learned of her pregnancy raises a strong inference that Brown was disturbed by the development. An employer's compliance with the law in certain specified circumstances does not refute an allegation of discrimination in another less clearly defined context.
 
 
 24
 In sum, after a thorough consideration of the record as a whole, we are left with a "definite and firm conviction that a mistake" was made in denying Beatty relief. United States v. Gypsum, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). We are convinced that the Center's explanation for its employment action is inherently incredible as a matter of law and must, therefore, be regarded as a pretext for discrimination. We further conclude that the district court erred in assessing the plausibility of the Center's attempt to refute the prima facie case of employment discrimination presented by the appellant.
 
 III.
 
 25
 For the foregoing reasons, the judgment of the district court in favor of the Center is reversed. The matter is, accordingly, remanded to the district court with directions that judgment be entered in favor of the appellant and that an appropriate determination of damages be made.
 
 
 26
 REVERSED AND REMANDED.
 
 HAYNSWORTH, Senior Circuit Judge, dissenting:
 
 27
 Were we called upon to find the facts on the basis of this written record, I would agree the most logical inference is the one drawn by the majority. We are not the fact finder, however. The case was tried to the district court, and it was for the district court to determine which witness to believe and to draw any permissible inference warranted by the direct evidence. Anderson v. Bessemer City, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1512-13, 84 L.Ed.2d 518 (1985).
 
 
 28
 The inference drawn by the majority is not so compelled as to foreclose the district court's finding that the act of the employer was the product of a misunderstanding rather than of a deliberate intention to discriminate against the pregnant plaintiff. That was Brown's testimony, and the district court was free to accept it notwithstanding the fact that Brown might have been more helpful to the plaintiff by disclosing the details of the considerations entering into the employer's decision and suggesting possible means of avoiding the problem.
 
 
 29
 This was a hiring situation, but the employer had demonstrated its flexibility and adaptability in meeting the needs of pregnant employees. That history suggests no predisposition to withdraw employment offers when the prospective employee becomes pregnant before her employment actually commences. See Holsey v. Armour & Co., 743 F.2d 199, 207 (4th Cir.1984), cert. denied, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985).
 
 
 30
 The majority opinion is an excellent argument for the plaintiff on the facts, but I would accept the finding of the district court as being not clearly erroneous.
 
 
 
 *
 See 823 F.2d 60
 
 
 [1]
 Chesapeake Developmental Unit, Inc., in combination with Chesapeake Center, Inc. and Chesapeake Group Homes, Inc., comprise an integrated private social service agency in the State of Maryland
 
 
 [2]
 A P.P.D. is a skin test for tuberculosis. If the result of the test is negative, no further examination is required. If a positive result is achieved, the subject must undergo a chest x-ray to determine whether the disease is present in a communicable stage
 
 
 [3]
 Title VII of the Civil Rights Act of 1964 forbids employment discrimination on the basis of sex, and Section 701(k) of the Act provides that "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth or related medical conditions." 42 U.S.C. Sec. 2000e(k)