**Sandra K. BEATTY,**
**Plaintiff–Appellant,**
**v.**
**CHESAPEAKE CENTER, INC.; Chesa-**
**peake Developmental Unit, Inc.; Chesa-**
**peake Group Homes, Inc., Defendants–**
**Appellees.**

**No. 86–1176.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 6, 1987.

Decided Dec. 10, 1987.

Eileen McGinley Stein, Chevy Chase, Md. (Leslye Orloff, Washington, D.C., on brief), for plaintiff-appellant.

Waller S. Hairston (Henry, Hairston & Price, Easton, Md., on brief), for defendants-appellees.

Before WINTER, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN, CHAPMAN, WILKINSON and WILKINS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge, sitting en banc.

HAYNSWORTH, Senior Circuit Judge:

Sandra K. Beatty brought this action alleging employment discrimination because of her pregnancy. During a bench trial, there was conflicting testimony about what was said, during an employment orientation session, regarding the plaintiff's undergoing a tuberculin test. At the conclusion of the hearing, the district judge announced his findings and his acceptance of the testimony of Mary Brown, the manager of the unit.

On appeal, a divided panel of this court reversed upon the ground that Brown's testimony was so inherently improbable as to be unbelievable. Concluding that the prima facie case that the plaintiff had made

out was entirely unrebutted, the court directed the entry of judgment for the plaintiff. *Beatty v. Chesapeake Center, Inc.*, 818 F.2d 318 (4th Cir.1987).

Upon consideration of the defendant's petition for rehearing, a majority of the judges of this court in regular active service granted a rehearing before the *en banc* court. 823 F.2d 60 (4th Cir.1987).

I.

Chesapeake Center is a privately operated social agency subject to extensive regulation by Maryland. Late in 1983, Beatty applied for a position as an instructor of mentally retarded adults. After an interview with the unit's manager, Brown, Beatty was offered a job on December 2, 1983.

Beatty reported for orientation on January 16, 1984. She was wearing a maternity blouse. Beatty told Brown she was pregnant, though she had not known she was pregnant when she sought the job several weeks earlier. Each of the women testified that they agreed that Beatty's pregnancy created no real employment problem. In the past, the Center had granted maternity leave on ten separate occasions without encountering any serious problem.

Brown had Beatty sign an employment agreement, after which they proceeded with the orientation process. The employment agreement contained a provision that the employee must be willing to undergo annual physical examinations, including tuberculin tests, and the orientation instructions directed inquiry to that matter. Beatty presented a certificate of Charles County, Maryland, to the effect that she was free of communicable tuberculosis on October 4, 1981. She also presented a letter from her physician that a tuberculin test had been administered on November 4, 1982, with negative results. Earlier, a skin test on Beatty had been read as positive for tuberculosis, although subsequent chest x-rays were read as being negative.

The two women engaged in a discussion of the matter. There was no agreement as to exactly what was said but it is clear that Beatty had some concern about undergoing tuberculin testing because of her pregnancy, and that she thought her records of prior testing should be accepted as satisfying the requirement. At one point in her testimonial version of what was said, Beatty testified that she had told Brown "It's probably good that I'm certified because it probably wouldn't be healthy for me to have one at this time."

If one accepts Beatty's testimonial version of what was said at the orientation session, one cannot reasonably construe it as an adamant refusal to take the test. Brown testified, however, that she understood Beatty to have told her that Beatty would not take the test, though she was pleased that she need not take it.

Brown interrupted the orientation session to consult the Center's director, John Wright. According to both Brown and Wright, Brown told Wright that Beatty was refusing to take the test, but sought to satisfy the requirement by her evidence of the results of earlier testing. Upon Wright's instructions, Brown told Beatty that the orientation process was suspended because of Beatty's "change in status," but promised to be in touch with her.

Upon Wright's instructions, Brown contacted the public nurse at the Talbot County, Maryland, Health Department, the Center's contact for TB tests. The nurse told her that Beatty's documentation was stale and could not be accepted.

Brown wrote to Beatty, stating, "In light of your stated position of not subjecting yourself to a tuberculin test at this time, we are unable to continue to process you as a new employee."

Beatty immediately contacted her physician, who told her that a tuberculin test would not be harmful in her present condition. Beatty then wrote to Brown, explaining her willingness to take a TB test. Brown responded that the job had been filled.

It is a matter of some significance that when Beatty responded on January 23, 1984, to Brown's letter of January 20, 1984, she did not say that Brown had misstated or misconstrued what Beatty had said during the orientation session. Beatty admitted that she had said that "I didn't think it would be healthy to have the TB test done because I am pregnant," though she said the statement was made in the context of her belief that the results of the earlier tests made it unnecessary for her to be

tested again. Nor did she claim that she would have expressed a willingness to take the test if she had been told during the orientation meeting that the results of the earlier tests were unacceptable. Instead, she said that, upon receipt of Brown's letter, she called her physician and was then told that she might safely take the test. On the basis of that fresh advice, she told Brown that she was then willing to take the test.

There was also testimony that, earlier, some new employees had been allowed to commence work before undergoing the test several weeks, even months, later, but there was also evidence that the Center's operations would soon be reviewed in connection with recertification procedures and that strict compliance with the state's regulatory rules was thought to be necessary to assure the necessary recertification.

## II.

The role of the fact finder is vested exclusively in the district judge, to whom the case was tried without a jury. We have no power to set aside those findings of fact unless they are "clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). A finding may be clearly erroneous if the testimony tending to support the finding is so internally inconsistent or implausible that it could not be accepted by a reasonable fact finder. *Id.* at 575, 105 S.Ct. at 1512-13.

Brown's story is neither so internally inconsistent nor so implausible as to possess no believability.

That enforcement of the tuberculin test rule for new employees had been somewhat lax in the past might justify an adverse inference by the fact finder, but no such inference was compelled in light of the testimony about preparation for the impending review of operations.

There is no such inconsistency or implausibility in Brown's testimonial version of what Beatty said during the orientation procedure. Brown testified that Beatty had told her that Beatty was unwilling to take the test at that time because of her pregnancy. That was what Brown reported to Wright, as confirmed by Wright's testimony, and that is what Brown said in her letter to Beatty, a statement which went without direct refutation in Beatty's response.

The fact that Brown questioned Beatty as to whether Beatty knew of her pregnancy at the time the position was offered to her would lend support to an adverse inference, but no adverse inference was compelled in light of the testimony that both women agreed that the pregnancy would create no serious employment problem.

Finally, Beatty contends that the Center's story is plausible only if Brown and Wright acted for a discriminatory purpose with a discriminatory intent, but the contention is founded upon complete acceptance of Beatty's testimonial version of what was said during the orientation procedure. That, this court may not do, for Beatty's testimonial version of what was said was contradicted by Brown, and the letters of January 20 and January 23 tend to support Brown's testimonial version of what was said rather than Beatty's.

The district judge heard the testimony and saw the witnesses. It was for him, not for us, to decide whom and what to believe.

## III.

The judgment of the district court is affirmed.

AFFIRMED.

HARRISON L. WINTER, Chief Judge, concurring:

Since a majority of the active judges voted to rehear this case in banc and since I have a duty to sit and to vote, I concur in Judge Haynsworth's opinion. I do so reluctantly, not because I have any doubt that affirmance is proper, but because I am convinced that the case should not have been heard by the in banc court even if it was incorrectly decided by a majority of the panel.

The determination of causes by a court of appeals sitting in banc is governed by

Rule 35, F.R.App.P. In pertinent part, the rule is:

**Rule 35. Determination of Causes by the Court in Banc**

**(a) When Hearing or Rehearing in Banc Will be Ordered.** A majority of the circuit judges who are in regular active service may order that an appeal or other proceeding be heard or reheard by the court of appeals in banc. Such a hearing or rehearing is not favored and ordinarily will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance.

From a reading of the panel opinions and of Judge Haynsworth's opinion for the in banc court, it is manifest that even the erroneous panel opinion did not breach the uniformity of our decisions,[*] nor did it involve a question of exceptional importance. At most it was a judgment call on disputed facts. It follows that if the letter and spirit of the rule were observed the case should not have been reheard in banc. The in banc court consisted of twelve judges. During the time consumed in rehearing this case in banc, they should have sat in four panels and heard four other cases.

Judge PHILLIPS authorizes me to say that he concurs in this opinion.

MURNAGHAN, Circuit Judge, concurring:

Here we had a sympathetic plaintiff's case where the evidentiary material submitted to the trial judge was indicative of either of two possible results. There were facts which would adequately support a finding for the plaintiff. There also, however, were facts adequately to support a finding for the defendant. Both the majority and dissenters on *en banc* appeal appear to accept the rule of *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). That case of binding authority made crystal clear that, in a court trial, a district court's determination which the appellate court finds uncongenial must, nevertheless, be affirmed as to an issue of fact unless clearly erroneous.

The *en banc* dissenters (two of twelve appellate judges, that is two of thirteen judges who have heard the case if the district judge is included) allowed themselves to be swayed by the apparent uncongeniality. By doing so, they gave lip service to the rule but then, by proceeding to find the district judge to have been clearly erroneous where there nonetheless was adequate evidence to support his finding, actually emasculated the ruling. If the holding of the majority at the panel level (the dissenters on *en banc* appeal) had prevailed, we would be met with a departure from the spirit of the ruling in the *Anderson v. City of Bessemer City* case, which we would have found difficult to correct in view of the precedential value of such a holding.

Chief Judge Winter seeks to dismiss the case as merely a judgment call on disputed facts. He regrets the time consumed in rehearing the case *en banc* and the waste of valuable court resources in a sitting requiring the presence of all the judges when otherwise other cases could be heard. However, this was not merely one involving a disagreement as to which of two disputed factual findings should prevail. Even if every appellate judge found more acceptable the version of the facts as they appear to the dissenters, they were, nevertheless, bound to accept the contrary findings of the district judge inasmuch as they had sufficient evidentiary support.

To me it is somewhat disturbing to imagine handing down an incorrect and, therefore, unjust decision, but I recognize that there can be cases of that kind which do not merit *en banc* reconsideration. However, one reason for *en banc* hearing is the security and maintenance of uniformity in

[*] I emphatically reject Judge Murnaghan's thesis that the uniformity of our decisions is breached whenever it may be argued that a panel opinion incorrectly applies a basic Supreme Court precedent. Were this view to prevail, we ought to hear or rehear every appeal in banc, notwithstanding Judge Murnaghan's disavowal to the contrary, because in every appeal there is some basic Supreme Court holding which is involved.

our decisions. *See* FRAP 35(a). That requirement, as use of the word "or" indicates, is disjunctive of the grounds for an *en banc* hearing or rehearing "when the proceeding involves a question of exceptional importance." The holding in a Supreme Court case is one as to which we must strive to secure or maintain uniformity. The case presented here had to be heard *en banc* to secure or maintain such uniformity, and I regard it as important that we do not encourage the ill-conceived notion of "achieving justice" for the sympathetic party by ignoring the factual evidence and the district court judge's decision.[1]

I have already indicated my concurrence with the fine opinion produced by Judge Haynsworth. I concur specially, not to suggest that my enthusiastic acceptance of what Judge Haynsworth has written is in any way diminished, but to present a view

that it was necessary and important that we take the trouble to hear the case *en banc* and that Judge Haynsworth trouble himself to write and to write correctly.

Judge Widener has authorized me to say that he concurs in my opinion. In doing so, he does not intend to reduce in any way the strength and enthusiasm of his concurrence in Judge Haynsworth's opinion for the *en banc* majority.

**K.K. HALL, Circuit Judge, dissenting:**

Although it mandated great deference to a district court's findings of fact, the Supreme Court in *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), articulated a standard of appellate review, not a standard that precludes review. Even a decision that re-

---

1. One of the court's techniques for promoting justice is randomly to select panel members to hear cases, customarily in groups of three. Here the technique has led us into an unfortunate bog—a veritable Slough of Despond. When the judges were originally assigned for panel consideration of the case, there was, of course, no way of knowing prior to argument how the panel members, or the non-panel members, of the court would vote. However, in retrospect, it now appears that there was only an extraordinary concatenation of circumstances which led to the problem Judge Haynsworth's opinion *en banc* addresses. If any judge, other than either of the two members making up the panel majority, had been selected, the decision below would have been correct and, in all probability, would never have been successfully petitioned to rehearing *en banc*. If either one of the panel majority had been replaced by any of the other nine judges (*i.e.*, the full complement of active circuit judges not counting Judge Hall or Judge Sprouse) in regular active service, he would not have voted at the panel level and his replacement would have sided with Judge Haynsworth, converting his dissent at the panel level to the majority opinion.

It appears that with twelve judges, namely, the eleven active circuit judges and one senior circuit judge, available for random selection to form the panel, there were 220 separate possible panels. Of those 220, ten only could be composed of both Judge Hall and Judge Sprouse.

The permutations of twelve judges organized into panels of three judges yields 1320 distinct possible panels. However, for our purposes a panel of Judge Hall, Judge Sprouse and Judge Haynsworth would be the same as Judge Hayns-

worth, Judge Sprouse and Judge Hall. Since there are six such irrelevant changes of order, to arrive at the correct number of combinations of randomly selected different panels we must divide by six. (The six different panels which are identical for these purposes are: Judge Hall, Judge Sprouse, Judge Haynsworth; Judge Hall, Judge Haynsworth, Judge Sprouse; Judge Haynsworth, Judge Hall, Judge Sprouse; Judge Haynsworth, Judge Sprouse, Judge Hall; Judge Sprouse, Judge Hall, Judge Haynsworth; Judge Sprouse, Judge Haynsworth, Judge Hall). That yields 220 (1320/6) as the number of possible panels. Using the same technique we find that ten different panels of the 220 possible could include in their makeup both Judge Hall and Judge Sprouse. The likelihood, therefore, of the wrong decision here being reached at the panel level was 4.54% (10/220). I submit that to leave the panel decision undisturbed would embody an error of 4.54% in a system which we have introduced to bring about success in the quest to achieve full and fair justice. It is, in short, necessary to say that the oft repeated rule that judges on the Fourth Circuit are fungible, or at least fungible enough to insure the correct result, did not work in the panel selection here.

The defendant's counsel here would have much to complain of since 95.46 times out of 100, he would and should have won. (He should have won 100% of the time.) It is distasteful to me to see the work of the court take on the guise of a roulette wheel operated by chance. I stick emphatically by my suggestion that there has not been security and maintenance of uniformity in our decisions. It may even be argued that we have here a proceeding which involves a question of exceptional importance.

lies upon an assessment of witness credibility may be reversed as "clearly erroneous" when the witness's account viewed "in light of the record in its entirety" is "implausible on its face." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1512. *See also, Bishopp v. District of Columbia,* 788 F.2d 781 (D.C.Cir.1986).

For the reasons previously stated in the majority opinion in *Beatty v. Chesapeake Center, Inc.,* 818 F.2d 318 (4th Cir.1987), I remain convinced that the Chesapeake Center's explanation for its prima facie act of employment discrimination was utterly unworthy of belief. The *en banc* majority's contrary conclusion suggests the "conclusory" application of Rule 52(a) which Justice Powell cautioned against in his concurring opinion in *Anderson.* I, therefore, respectfully dissent from the decision which the *en banc* majority announces today.

I am authorized to state that Judge Sprouse joins in this opinion.