UNITED STATES of America,
Plaintiff–Appellant,

v.

Jay GREGORY, Sheriff of Patrick County, a Constitutional Officer of the Commonwealth of Virginia and elected under the laws of the Commonwealth, Defendant–Appellee,

and

Jesse Williams, Sheriff of Patrick County, Defendant.

No. 88–2839.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1988.

Decided April 14, 1989.

Irving Gornstein (William Bradford Reynolds, Asst. Atty. Gen., Jessica Dunsay Silver, U.S. Dept. of Justice, on brief), for plaintiff-appellant.

Anthony Paul Giorno, County Atty., for defendant-appellee.

Before HALL and MURNAGHAN, Circuit Judges, and HOWARD, United

12. Appellant's motion to strike part of the record is denied.

States District Judge for the Eastern District of North Carolina, sitting by designation.

MURNAGHAN, Circuit Judge:

In June 1983, the United States filed suit against Jesse W. Williams, the Sheriff of Patrick County, Virginia, complaining that he had followed and continues to follow a practice of refusing to consider women for deputy sheriff positions in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[1] The Government sought prospective relief to prevent further discrimination through the active recruitment of women to deputy sheriff positions. It also sought back pay and jobs for those denied employment on the basis of their sex.

In November 1983, Sheriff Williams suffered defeat in a reelection bid and was replaced by Jay Gregory, who was then substituted as the defendant.

After a full trial without a jury, the Honorable Jackson L. Kiser dismissed the complaint, ruling that deputy sheriff positions in Patrick County are not covered under Title VII because they fall within the "personal staff" exemption.[2] *United States v. Gregory*, 582 F.Supp. 1319 (W.D. Va.1984). We vacated the decision and remanded in light of *Curl v. Reavis*, 740 F.2d 1323 (4th Cir.1984).[3] On remand, Judge Kiser held that the positions of road deputy, investigator and shift supervisor fell within the "personal staff" exemption, as he had originally concluded. He also held that with respect to the fourth deputy position, that of a corrections officer, maleness was a BFOQ.[4]

On appeal, the Fourth Circuit once again reversed, holding that the "personal exemption" did not apply and that the defendant had failed to prove that a female corrections officer could not be accommodated by reasonably rearranging job responsibilities within the jail. *United States v. Gregory*, 818 F.2d 1114 (4th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). We remanded the case to the district court for consideration of the merits.

Upon remand, Judge Kiser evaluated the sufficiency of the evidence presented by the Government and held that the Government had failed to carry its burden of showing that the Sheriff exercised a discriminatory practice of refusing to hire women who but for their gender would have been hired in deputy positions. More specifically, Judge Kiser discredited the statistical evidence presented by the Government and characterized the women witnesses' testimony as merely anecdotal and insufficient. Although Judge Kiser appeared to credit the Sheriff with making certain admissions regarding his practice of never hiring a woman for deputy positions, Judge Kiser characterized the Sheriff's statement on one occasion as a joke and ignored its significance at other times. Because the district court applied an incorrect legal standard in assessing the statistical evidence presented by the Government and because it did not accord proper weight to the Sheriff's admissions and the testimony of the complainants, reversal is warranted.

The case presents three issues:

A. Whether the district court erred in refusing to consider the admissions which the Sheriff made concerning his policy of refusing to hire women for deputy positions in violation of Title VII.

---

1. The case was properly referred to the Department of Justice by the Equal Employment Opportunity Commission (EEOC). A charge of discrimination was filed with the EEOC by Doris Scales on July 30, 1980, alleging that Sheriff Williams unlawfully refused to hire her in May, 1980 as a deputy on the basis of her gender. This case also involves similar allegations by Wanda Hylton, Kathy Sheppard and Stephanie Ressel. For a more detailed recitation of the facts, see our earlier opinion at 818 F.2d 1114 (4th Cir.1987).

2. *See* 42 U.S.C. § 2000e(f).

3. *United States v. Gregory*, 84–1613 (4th Cir. Oct. 1, 1985).

4. Memorandum and Order entered July 18, 1986. Judge Kiser did find that Sheriff Williams had discriminated against Stephanie Ressel in filling the courtroom security position.

B. Whether the district court erred in refusing to consider the Government's statistical evidence offered to support its burden of showing that the Sheriff had a practice or policy of refusing to consider and hire women for deputy positions in violation of Title VII.

C. Whether the government would be entitled to prospective relief to prevent further discrimination and make-whole relief for Doris Scales and Kathy Sheppard.

### I.

The Government's theory of discrimination was simply that the Sheriff, in violation of Title VII,[5] regularly and purposely treated women less favorably than men when making hiring decisions for deputy vacancies. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977). The alleged disparate treatment resulted from the Sheriff's acceptance of the proposition that women were incapable of performing the duties of deputies.[6] The Government further alleges that the Sheriff refused seriously to consider any female applicants for deputy positions, and that the applicants were otherwise superbly qualified and scored significantly higher on the written examination than the male applicants who were ultimately hired.[7]

It is usually a rare case where the district court, under the clearly erroneous standard of review, is reversed. *See Beatty v. Chesapeake Center, Inc.,* 835 F.2d 71 (4th Cir.1987) (*en banc*). That is so be-

cause the district court's factual findings must be affirmed if there is evidence to support them and cannot be reversed unless the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). After a review of the entire evidence, we are convinced that such mistakes were made here.

As plaintiff with the burden of proving a *prima facie* case of discrimination, *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), the Government offered three types of evidence: (1) the Sheriff's admissions that he had a policy not to hire women for deputy positions; (2) statistical evidence; and (3) the testimony of the complainants. We separately consider the issues raised on appeal.

### II.

#### A. The Sheriff's Admissions

■ The Government presented testimony indicating that at least on four separate occasions the Sheriff had admitted that he had a policy of discriminating against women when considering them for deputy positions. First, Wanda Hylton, though Sheriff Williams denied ever making the statement, asked Sheriff Williams if he would consider hiring a woman as a deputy. According to her testimony, the Sheriff "chuckled and said, no, that he didn't hire women deputies; he didn't think they could handle the job; they couldn't handle the men."

Once the pattern or practice has been proved, an inference is raised that all employment decisions, during the period in which the discriminatory practice has been in force, were made in pursuit of the policy. The burden shifts to the employer to provide a lawful reason for denying employment to the class member. *Id.* at 362, 97 S.Ct. at 1868. If the employer provides a lawful reason, the burden shifts back to the Government to show that the reason was pretextual.

---

5. Title VII provides, in pertinent part:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....
 42 U.S.C. § 2000e–2(a).

6. The Government had to show by a preponderance of the evidence that sex discrimination was the Sheriff's standard operating procedure—the regular rather than the unusual practice. *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855.

7. At the "liability" stage, the Government is not required to show that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. *Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867.

Hylton did not actually apply for a deputy position, but was hired as a dispatcher. The district court thought it was particularly noteworthy that she did not hear Sheriff Williams make any other negative statement about women during her 7–month tenure at the Sheriff's Department and that she failed to apply for any other position while there. However, Hylton did testify, and Sheriff Williams confirmed, that the two of them did not get along. She also testified that after her initial discussion with Sheriff Williams, she considered it futile to apply for a deputy position. The Supreme Court has recognized that when an employer's discriminatory policy is known, subjecting oneself to the humiliation of explicit and certain rejection is not required to make out a case of discrimination. *Teamsters*, 431 U.S. 324, 365, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977).[8]

The district court further discounted Hylton's testimony by characterizing Sheriff Williams' statement as a joke. Here the district judge clearly erred. There was no evidence to support such a finding. The characterization established that the statement had been made. Sheriff Williams did not testify that he was joking when the statement was made; he only denied making the statement. The district court deduced its finding from the testimony of Hylton, who said that the Sheriff chuckled when he admitted to his policy of not hiring female deputies. Yet, contradictorily, it was assumed that Sheriff Williams was being "serious" when he next told Hylton that if she were truly interested in law enforcement, she should apply with the state police. The real point is that the district court erratically refused to recognize the Sheriff's bold admission of discrimination because the Sheriff was good-humored when he made it.

The second admission was made to Doris Scales at several different times during her application, interview and followup discussions with Sheriff Williams. Scales testified that Sheriff Williams stated that he did not "have any plans now, or in the near future, to hire any women for deputies" because he did not "feel like they're capable of handling the job as a deputy." In effect, the district court simply ignored testimony to that effect, because it failed to make any finding concerning these admissions. In that it was in error.

The third admission was made by Sheriff Williams while he testified. He admitted on the stand to having a policy of refusing to hire women as corrections officers. He claimed that his policy was justified because of his concern for the inmates' privacy. However, the evidence also showed that the jail used video cameras to supervise and observe the inmates in their cells and that the cameras were viewed by the dispatchers, many of whom were women. Furthermore, we had in a prior opinion in this oft recurring case found that Sheriff Williams' concern about inmate privacy was not a justification for his discriminatory policy against women with respect to the corrections officer positions. *United States v. Gregory*, 818 F.2d at 1117–18.

Finally, Mr. Giorno, the county attorney who represented Sheriff Williams, made a relevant statement to Amelia Badillo Montez, an equal employment opportunity specialist who was investigating Scales' complaints against the Sheriff. Montez testified from her notes regarding a telephone conversation she had with Giorno. She stated that "Mr. Giorno repeated that the sheriff wants big, tall men for that job [patrolman], that could defend themselves and be somewhat imposing." She added that Giorno said, "Females don't have a chance in this position." The district court held that Montez's testimony and her notes were inadmissible hearsay as a conversation between her and the attorney. Judge Kiser expressed the view that Giorno was not speaking for the county and that he was representing only Sheriff Williams.

The Government argues that the statement falls within a hearsay exception and should have been admissible as an autho-

**8.** "When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Id.* at 365–66, 97 S.Ct. at 1870.

rized statement or as an agent's statement under Fed.R.Evid. 801(d)(2).[9] The Sheriff, not surprisingly, urges that the law is to the contrary. No party has advanced any argument beyond the rule itself. Although there is relatively little authority on the subject of admissibility of an attorney's extrajudicial statements on a client's behalf, *see McCormick on Evidence* § 267, at 791 n. 21 (1984), we have addressed the issue in *United States v. Martin,* 773 F.2d 579 (4th Cir.1985). That case involved a prosecution for tax evasion. The defendant's attorney had told the IRS auditor that the defendant had made additional unreported income by selling chickens. The statement was made pretrial during the course of the lawyer's representation of the defendant.[10] Because the statement did not rise to a level of criminal liability,[11] the attorney had not exceeded the scope of his authority. The statement was, therefore, admissible. *Id.* at 583. It is not suggested that the statement exposed Sheriff Williams (or Giorno) to criminal liability.

■ In this case, the district court recognized that Giorno was representing the Sheriff. The admission was made in the context of the discrimination claim as to which Sheriff Williams required Giorno's services. The admission should have been admitted in evidence and the failure to do so was error.

**9.** Rule 801(d)(2) states in pertinent part:
 A statement is not hearsay if—
 The statement is offered against a party and is ... (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship....

**10.** The attorney acted pursuant to a power of attorney filed with the IRS. However, this Court found that despite the limited nature of the power of attorney, the attorney still dealt with the IRS auditors as Martin's representative.

**11.** The attorney had qualified the statement by asserting that the defendant did not know that the additional income was reportable.

**12.** Most "pattern and practice" cases are proved through the use of statistics. *Teamsters,* 431 U.S. at 339, 97 S.Ct. at 1856. This is most likely

As the Government has pointed out, if the admissions are credited, the Title VII violation has been proven. Reversal is warranted on that basis alone. In addition, the Government also has bolstered its case with statistical evidence.

**B. The Statistical Evidence**

The Supreme Court has recognized the importance of statistical evidence in proving Title VII violations. *Teamsters,* 431 U.S. at 341 & n. 20, 97 S.Ct. at 1857 & n. 20.[12] The Government presented the following statistical evidence. The Sheriff's Department of Patrick County has never employed a woman as a deputy. During the four years that Sheriff Williams served, he hired only men to fill the 30 vacant deputy positions which arose. Of these, 19 were new hires and the remaining 11 were carryovers from the previous administration. Similarly, Sheriff Gregory, Sheriff Williams' successor, during his brief tenure prior to the trial, hired 16 deputies, all of whom were men. Statistically, 14 were carryovers and two were new hires.[13]

The district court concluded that the statistical evidence was "meaningless" because it did not include applicant flow data and because the Sheriff carried over incumbent deputies, which greatly reduced the Sheriff's opportunity to hire new deputies. There are at least two flaws in such reasoning: (1) applicant flow data is not re-

true today because the typical employer, sensitized to Title VII penalties, will not adopt a blatantly intentional policy of discrimination, such as in this case where the Sheriff admitted to having such a policy.

**13.** The district court found that Sheriff Williams made 22 appointments, again, however, 11 of which were reappointments of employees he "inherited from his predecessor." In a footnote, the district court stated that Sheriff Williams made 18 new appointments to the office of deputy sheriff and Sheriff Gregory retained 20 of the 22 carryovers from his predecessor and eliminated one position. We note that these unexplained differences in the number of appointments is not significant to our finding that the statistical evidence should not have been ignored by the district court.

quired to prove discrimination through statistics and (2) deputy incumbency and short tenures may not obscure or excuse the fact that Sheriff Williams had the opportunity to hire women in noncarryover deputy positions at 19 separate times (as conceded at oral argument) and he never did.

First, the Government correctly points out that applicant flow data is not required to prove discrimination through statistics. In the first Title VII case in which the Supreme Court approved the use of statistics to prove a *prima facie* case of discrimination, the Supreme Court expressly recognized the probative value of statistical evidence that compares the proportion of minorities in the relevant work force to their proportion in the general population, without regard to applicant flow. *Teamsters*, 431 U.S. at 339 & n. 20, 97 S.Ct. at 1856 & n. 20. In fact, as the Supreme Court noted, "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic [and in this case, gender] composition of the population of the community from which employees are hired." *Id.* at 340 n. 20, 97 S.Ct. at 1856 n. 20. In rejecting petitioner's argument that such a comparison should never be given decisive weight, the Supreme Court stated: "Evidence of longlasting and gross disparity between the composition of a work force

and that of the general population thus may be significant...." *Id.*[14]

Building on the approval of statistical data in *Teamsters*, the Supreme Court had another occasion to discuss applicant flow data in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). In *Hazelwood*, the Court recognized that when special skills were required for a particular job, statistics comparing the percentage of minorities in the general population were not as probative.[15] *Id.* at 308 n. 13, 97 S.Ct. at 2742 n. 13. Similarly, the Court noted that applicant flow data would be relevant and should be considered by the district court on remand[16] if it could be adduced.[17] *Id.* The Supreme Court clearly did not require that such information be obtained for the statistical evidence to be significant and outrightly rejected petitioner's argument that it was required.

 In the case at bar, the relevant labor pool did not require any special skills to qualify as applicants for the position of deputy.[18] Furthermore, this Court has held that in those situations where it cannot be said as a matter of law that either special skills are or are not required, the burden rests on the "defendant to establish that the positions in fact do require special qualifications not possessed or readily acquired by the general population, at peril of having the general population statistics

**14.** The Supreme Court also acknowledged the reality that others can be injured by discriminatory policies besides those who actually requested employment opportunities. *Teamsters*, 431 U.S. at 365, 97 S.Ct. at 1869. Thus, applicant data may not always be available, and should not render statistics "meaningless" because the policy itself may have deterred job applications from those who understood that their attempts would be futile.

**15.** The relevant labor pool for comparison would be the percentage of minorities possessing the special skills or experience required to perform the duties of the job. The Supreme Court did not completely rule out the use of general population comparisons in special qualification cases. *See Equal Employment Opportunity Commission v. Radiator Specialty Co.,* 610 F.2d 178, 184 n. 7 (4th Cir.1979).

**16.** The case was remanded because of several errors on the part of the district court, including its finding that the statistical evidence was non-

probative because it did not compare the proportion of black school teachers to the proportion of black school students.

**17.** The Supreme Court noted earlier that the parties disagreed whether the race of the applicants could be obtained from the record.

**18.** Under Virginia law, an applicant for deputy sheriff must be a United States citizen, have a high school diploma or the equivalent, have a valid driver's license, complete a physical examination and undergo a background investigation. Va.Code § 15.1–131.8 (Cum.Supp.1988). Sheriff Williams also required applicants to fill out a written application, at least most of the time, and to pass a written test.

However, those requirements were not always adhered to. For example, several deputies had never taken the written test.

presumed appropriate in assessing plaintiff's *prima facie* proof." *Equal Employment Opportunity Commission v. Radiator Specialty Co.*, 610 F.2d 178, 185 (4th Cir.1979).[19] Although the Government apparently did not supply census data demonstrating the percentage of women in the labor pool in Patrick County, we take judicial notice of the fact that no less than 50% of the relevant labor pool is comprised of women.[20] The district court was clearly in error when it refused to consider the statistical data presented by the Government.

Once the Government shouldered its burden of proving a *prima facie* case of discrimination, the burden shifted to the Sheriff to rebut the proof.[21] The Sheriff clearly has offered no evidence, other than fallacious criticisms of the statistical evidence. Again, the Supreme Court has recognized that such failure on the part of the defendant to rebut the inference of discrimination comes not from a misuse of statistics, "but from 'the inexorable zero.'" *Teamsters*, 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23.

Second, deputy incumbency and short tenures cannot excuse the fact that the opportunity to hire women existed on 19 specific occasions,[22] but no women were hired. Sheriff Williams, in fact, had at least three opportunities to hire a woman, but chose instead to hire less qualified male applicants.[23]

The district court's reliance on the fact that many of the positions were filled with "carryover" deputies from the previous administration, thus reducing the opportunity to hire women, appears also to be flawed. The district court and the Sheriff point out that the deputies serve at the will of the Sheriff who appointed them. Va.Code § 15.1–48 (Repl.Vol.1978 & Supp.1983). A deputy sheriff has no expectation of appointment or reappointment outside the personal relationship he has with the Sheriff. *Whited v. Fields*, 581 F.Supp. 1444, 1453 (W.D.Va.1984). Therefore, *all* of the positions, both new and carryovers, are legally open positions for which Sheriff Williams, and later Sheriff Gregory, refused seriously to consider women.[24] In-

**19.** If the defendant succeeds in meeting that requirement (Sheriff Williams did not), the plaintiff should have an opportunity to adjust its statistical proof to reflect a labor pool base with the special qualifications. *Id.* We further elaborated on the equity of that allocation of proof, indicating that the defendant was the party with the most ready access to the relevant information. If it were otherwise, the plaintiff would all too late in the game discover that it could not rely on general population statistics. *Id.* n. 8.

**20.** The Supreme Court does not require fine tuning of statistics when the inference of discrimination arises from "'the inexorable zero.'" *Teamsters*, 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23. In other words, the focus in this case may properly be upon the fact that the Sheriff's Office has *never* hired a woman as a deputy.

**21.** The Sheriff could have done this by offering his own statistics, including applicant flow data, to demonstrate that he did not have women applying for deputy positions in statistically significant numbers.

**22.** Given that the labor pool is likely to consist of 50% women, the probability that a woman would not have been hired to fill one of the vacancies is 1 over 2 to the 19th power or 1/262,144. Given the population of Patrick

County of 17,000 people, the probability is overwhelming that at least one woman at some time during Sheriff Williams' tenure should have been hired if he did not have a discriminatory policy which excluded applicants on the basis of gender.

**23.** For example, Hylton had a college degree, a background in law enforcement and performed exceptionally well on the written test.

Stephanie Ressel also had a background in criminal justice and performed well on the written test. Sheriff Williams hired David Morse instead who had no experience in law enforcement and performed poorly on the written examination.

**24.** The district court also noted that the "small number of employees in the data base to begin with ... further diminishes the reliability of the Government's statistics." The Supreme Court considered the importance of a small sample size in *Teamsters* and concluded that it *may* detract from the value of the statistical evidence. *Teamsters*, 431 U.S. at 340 n. 20, 97 S.Ct. at 1856 n. 20. However, in this case, the small number of Sheriff's employees making up the data base cannot be seen as establishing statistical insignificance because it comprises the entire universe of available positions and does not merely constitute an unrepresentative sample.

voking a courtesy or carryover rule when the result is inexorably gender discrimination is inevitably an end run around the statute and its preeminent purpose.

Again, the district court was clearly in error when it refused to consider the Government's statistical data. The pattern or practice of discriminating against women stands so clearly revealed on the basis of the Sheriff's admissions and the statistical evidence that we do not need to rely, to establish the existence of pattern or practice, on the testimony of the three complainants to resolve the liability question.[25] We mention their testimony briefly, however, because of its relevance to the remedy issue in this case on remand.[26]

## C. The Proper Remedy

■ Finding no liability, the district court did not discuss a remedy. Although the question of a proper remedy should first be addressed by the district court, we regard it appropriate to provide some general guidance on the question, especially in light of the protracted nature of the case and the arguments advanced by the Sheriff asserting that no remedy is required or needed. We first observe that when a plaintiff has prevailed and established the defendant's liability under Title VII, there is no discretion to deny injunctive relief completely. See *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362,

2372, 45 L.Ed.2d 280 (1975); *United States v. County of Fairfax, VA*, 629 F.2d 932, 941–42 (4th Cir.1980), cert. denied, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981).

The Government requested injunctive relief [27] and makewhole relief. With respect to the first, the current Sheriff, Sheriff Gregory, argued that, under Virginia law, his administration is legally separate from Sheriff Williams' administration. Therefore, it is contended that injunctive relief as against him is inappropriate because the policy of discrimination practiced by Sheriff Williams no longer exists under the new administration. We reject this argument for both legal and factual reasons.

Under federal law, Title VII remedies have not been limited to correcting only ongoing discriminatory policies. District courts clearly have the authority and should exercise the power to grant injunctive relief even after apparent discontinuance of unlawful practices.[28] That is especially true where, as in cases such as the present one, the record does not demonstrate a total cessation of the unlawful practices. See *United States v. Virginia*, 22 Fair Empl.Prac.Cas. (BNA) 936, 937 (E.D.Va.1978), *remanded on other grounds*, 620 F.2d 1018 (4th Cir.), *cert. denied*, 449 U.S. 1021, 101 S.Ct. 589, 66 L.Ed.2d 483 (1980) (injunction will provide publicity aimed at eliminating lingering effects of discrimination).

---

**25.** In order to be awarded make-whole relief, however, the complainants must show that they were victims of the Sheriff's policy.

**26.** We have ascertained the presence of clear error in the district court's weighing of the testimony of the complainants. These three women testified at trial concerning their experiences with the Sheriff when applying for a deputy position, an attempt which was uniformly unsuccessful.

As indicated earlier, a fourth woman, Ressel, was awarded back pay for the discrimination she experienced when she applied for the position of corrections officer. The district court apparently viewed her case as an isolated incident, since it found that the other three women had not been victims of discrimination. However, as we discuss below, the evidence compels a finding that all four women were discrimi-

nated against by the Sheriff's practice of not seriously considering any women for deputy positions. Therefore, Ressel's testimony is relevant to support a finding that there was a practice to discriminate and that the Sheriff's admissions of such a practice were clearly not a joke.

**27.** The Government requested an injunction against future discrimination as well as an order requiring the Sheriff to make affirmative efforts to recruit women for deputy positions.

**28.** Title VII states, in pertinent part: "If the court finds that the respondent *has* intentionally *engaged in* or is intentionally engaging in an unlawful employment practice ... [the practice may be enjoined]...." (Emphasis added). 42 U.S.C. § 2000e–5(g). *See generally* Schlei & Grossman, *Employment Discrimination Law*, at 1415 (2d ed. 1983).

Here, the record indicates that the discriminatory practice continues. For example, Sheriff Gregory has not hired a female deputy [29] and he eliminated the civil process server position which Kathy Sheppard occupied under Sheriff Williams. Having found a pattern or practice of discrimination against women applying for deputy positions, the Government need not provide any further evidence to justify an award of prospective relief. *Teamsters*, 431 U.S. at 361, 97 S.Ct. at 1867.

Make-whole relief of back pay and an offer of the next available vacancy as a deputy or a dispatcher, at their option, are requested for Scales and Sheppard, but not for Hylton. Make-whole relief is justified when the Government has shown a practice or pattern of discrimination and the complainant applied for the job during the period when the discriminatory policy operated. The Sheriff could rebut such a *prima facie* case of individual discrimination by providing a lawful reason for not hiring the applicant. *Teamsters*, 431 U.S. at 361–62, 97 S.Ct. at 1867–68. Although the district court found that the Sheriff had presented

lawful reasons for not hiring Scales [30] and Sheppard,[31] after reviewing the record, we believe that the district court clearly erred in assessing the evidence. We find that the Government has shown the Sheriff's reasons to be pretextual. Therefore, reversal is warranted.

In conclusion, the district court should be reversed on its findings that the Sheriff did not have a policy or practice of discriminating against women in filling deputy positions and the case should be remanded for a decision on an appropriate remedy consistent with this opinion.

**REVERSED AND REMANDED.**

---

**29.** Sheriff Gregory testified that he did not have a discriminatory hiring practice: "I'm going to be guided by a policy that I will not intentionally discriminate against anyone." Sheriff Gregory also testified that he considered the fact that Kathy Sheppard was a woman in deciding whether she should be hired as a corrections officer.

**30.** Of the four different versions which Sheriff Williams offered to justify not hiring Scales, who was exceptionally qualified for the position of deputy, the district court relied on her alleged bad moral and credit reputation and her overbearing personality. Although the district court recognized that other evidence tended to disprove the asserted reputation, it stated that the Sheriff's good faith in relying on the information to protect the public perception of his administration justified his decision. However, this Court has refused to expand the "complete but very narrow immunity for employer conduct shown to have been undertaken in good faith in reliance upon an opinion of the EEOC" which the Supreme Court recognized in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 422, 95 S.Ct. 2362, 2374, 45 L.Ed.2d 280 (1974). *United States v. Gregory*, 818 F.2d 1114, 1119 (4th Cir. 1987). The district court erred in relying on the Sheriff's good faith when it realized that the

evidence manifestly showed that the Sheriff had no legitimate reason for not hiring Scales.

Other evidence reveals that the Sheriff hired male deputies who had worse credit problems than Scales; had retained two male deputies whose behavior indicated bad moral reputations while firing the female employee associated with those incidents; and had hired male deputies with poor driving records and past criminal records.

**31.** Sheriff Gregory did not rehire Sheppard after her job as civil process server was eliminated for budgetary reasons. Despite her excellent job evaluations and her experience, he refused to consider her for one of the two vacant deputy positions nor did he hire her instead for any of the 14 carryover positions. The district court interpreted the Government's position as requiring the Sheriff to "bump" another employee, which the law does not require him to do. However, that is a misinterpretation of the Government's argument. It contends that Sheriff Gregory refused to rehire Sheppard because, as he stated, her past performance was unsatisfactory. However, the clear evidence shows that she received the highest work evaluations, that her performance was excellent and that she was better qualified than other personnel whom Sheriff Gregory rehired instead.