Ronald A. BROWN, Plaintiff–Appellant,

v.

Jacqueline F. McLEAN; Mayor and City Council of Baltimore, Defendants–Appellees.

No. 97–1509.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 4, 1997.

Decided Oct. 30, 1998.

**900**

**ARGUED:** Howard J. Schulman, Schulman & Kaufman, L.L.C., Baltimore, Maryland, for Appellant. Kathryn E. Kovacs, Assistant Solicitor, Baltimore City Law Department, Baltimore, Maryland, for Appellees. **ON BRIEF:** Joseph S. Kaufman, Schulman & Kaufman, L.L.C., Baltimore, Maryland, for Appellant. Otho M. Thompson, City Solicitor, Joanne Evans–Anderson, Principal Counsel, Baltimore City Law Department, Baltimore, Maryland, for Appellees.

Before WILKINSON, Chief Judge, and ERVIN and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge ERVIN wrote the opinion, in which Judge MICHAEL joined. Chief Judge WILKINSON wrote a concurring and dissenting opinion.

## OPINION

ERVIN, Circuit Judge:

Plaintiff-appellant Ronald A. Brown brought this action against defendants Jacqueline F. McLean, his former supervisor, and the Mayor and City Council of Baltimore (the "city"), alleging that he was improperly terminated in a "purge" of white males from the upper management levels of the city Comptroller's office, and that his termination and the defendants' subsequent failure to rehire him in a different position violated Title VII of the Civil Rights Act of 1964 and his equal protection rights under 42 U.S.C. §§ 1981 and 1983. Brown appeals the district court's orders granting summary judgment and judgment as a matter of law in favor of the defendants, and the district court's decision to exclude certain evidence. For the reasons stated hereafter, we affirm.

### I.

At the time of his termination on July 1, 1992, Brown was employed by the City of Baltimore as Administrator of Telephone Facilities. In this position, Brown directed and coordinated the operations of all the city government's telephone services, including paging systems, cellular telephones, faxes, and computer networks. McLean was the elected Comptroller of Baltimore City at all times pertinent to this action, and Brown's supervisor. Brown is a white male; McLean is a black female.

McLean took office as the city's Comptroller on December 3, 1991. Apparently from the start of her tenure, McLean was quite vocal about what she perceived as a lack of diversity in her office. One of McLean's first acts as Comptroller was to complain that the portraits in the office were exclusively of white males and to have the portraits removed.

McLean appointed a transition team to assist her in assuming office, and on December 18, 1991, this team issued a report recommending, *inter alia,* that the municipal post office and telephone departments be combined into a "Communications Services Department" under one manager. According to this report, the restructuring would

"[u]se present personnel on board" and "take maximum advantage of proven personnel capabilities...." J.A. at 935. McLean adopted this recommendation, the city's Budget Office concurred with her, and the recommendation was forwarded to the city's Board of Estimates.

On May 13, the Board of Estimates, of which McLean was a voting member, made its budget recommendations to the City Council. These recommendations eliminated the position of Administrator of Telephone Facilities and added the position of Director of Communications Services ("DCS"), which encompassed both the duties held by Brown and oversight of the city's post office.

On May 26, Brown learned in a letter from McLean that his position was being abolished. The letter stated that it was through no fault of his own and that the change had been made pursuant to her transition team's recommendations. J.A. at 902. Brown's last day on the job was June 29, 1992. Prior to his departure, on June 26, Brown met with McLean for an exit interview. During their meeting, McLean asked him whether he would apply for the DCS position. Brown testified that he told her he thought he would. J.A. at 606. On July 1, 1992, Rochelle Young, a black man, was provisionally appointed to the Director of Communications Services position and began working in Brown's old office.

Baltimore City regulations required that any person holding a position that was abolished be placed on a re-employment list "for such position as, in the judgment of the Civil Service Commission, shall most nearly approximate the position abolished." Charter of Baltimore City, Art. VII, § 121, *in* J.A. at 1060. A person on the reemployment list for a particular position takes absolute priority over all other applicants for that position. Pursuant to this regulation, the Civil Service Commission placed Brown on the re-employment list for the position of Telephone Supervisor, for which there was no vacancy. The Telephone Supervisor is a working telephone operator sitting at a telephone switchboard console, who supervises other switchboard operators. Job requirements for the Telephone Supervisor position are a high school

diploma or its equivalency and five years switchboard experience. Brown has an M.B.A. and no experience as a switchboard operator.

There is conflicting evidence about why Brown was not placed on the preferred re-employment list for the DCS position. There was some suggestion that Brown was not placed on the list because the position included responsibilities that were not part of the Administrator of Telephone Facilities position that he had held prior to his termination. Elsewhere, and in oral argument, the city maintained that there was no re-employment list for the DCS position because it was a newly created position. Although provisions exist to allow laid-off employees to question the Civil Service Commission's determination, J.A. at 1033, Brown never contacted the Civil Service Commission to discuss his obviously improper placement on the re-employment list or the possibility of placing him on the re-employment list for a position more closely approximating his abolished job.

The DCS position was advertised in the newspaper and posted at the Civil Service Department for open competition. Because Mr. Young's appointment was originally provisional, he was required to compete with other applicants for the permanent position. After the competitors for the position were interviewed, Young was hired for the DCS position on a permanent basis. Brown never applied for the job through the open competition process.

On February 7, 1995, Brown filed suit against the Mayor and City Council of Baltimore and against McLean in her official capacity. Brown sought damages under 42 U.S.C. §§ 1981 and 1983 for violation of his Fourteenth Amendment right to equal protection, and under Title VII of the Civil Rights Act of 1964. The defendants filed a motion for summary judgment, which the district court granted in part and denied in part, and Brown filed a motion for partial summary judgment, which the district court denied. In response to the defendants' motion, the district court, adopting the reasoning of the recent decision in a related case, *Burtnick v. McLean*, 953 F.Supp. 121 (D.Md. 1997), held that the city was entitled to sum-

mary judgment on the claim of unlawful discrimination in the elimination of Brown's position and, because the DCS position had been filled by a male, on Brown's claim of discrimination based on sex. The district court, however, refused to grant summary judgment on Brown's failure-to-rehire claim, stating that Brown had established a genuine question of material fact that he was not hired for the DCS position because of his race.

Brown's motion for partial summary judgment asked the district court to hold that the city's affirmative action plan constituted a race and gender-based employment policy in violation of Title VII and the Fourteenth Amendment. The court denied this motion, again adopting the reasoning in *Burtnick*, 953 F.Supp. 121, and finding that there was no evidence that the actions of which Brown complained were taken pursuant to the city's affirmative action policy.

The case then went to trial on Brown's Title VII failure-to-rehire claim and his §§ 1981 and 1983 claims against the city. On the trial's first day, the district court dismissed McLean as a defendant, citing our opinion in *Burtnick v. McLean*, 76 F.3d 611 (4th Cir.1996), that held that individual members of the Board of Estimates are entitled to legislative immunity under § 1983. During the trial, the court, ruling on a motion in limine filed by the city, excluded the city's affirmative action plan from evidence.

At the conclusion of Brown's case, the city moved for judgment as a matter of law. The district court granted this motion, finding that Brown had not produced legally sufficient evidence that there was a city-wide policy that violated §§ 1981 and 1983, and that Brown had failed to establish a prima facie case of racial discrimination because he had not applied for the DCS position nor had he shown that such an application would have been futile. Brown now appeals numerous of the district court's above-mentioned rulings, on the grounds discussed below.

## II.

Brown's first assignment of error is that the district court erred in granting judgment for the city on his Title VII claim at the close of his evidence. Judgment as a matter of law is appropriate when "a party has been fully heard ... and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Fed.R.Civ.P. 50(a)(1). On appeal, we evaluate the sufficiency of the evidence *de novo,* while viewing the facts and drawing all reasonable inferences in favor of the nonmoving party. *Towler v. Sayles,* 76 F.3d 579, 581 (4th Cir. 1996). The district court granted judgment as a matter of law for the city on the ground that Brown had not shown either that he had applied for the DCS position or that such an application would have been futile, and that he therefore failed to establish a prima facie case of discrimination. We agree and affirm the district court.

In any Title VII action, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). More specifically, in order to prove a prima facie case of discriminatory failure to hire or promote under Title VII, a plaintiff must prove that: (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *See id.; Alvarado v. Board of Trustees of Montgomery Community College,* 928 F.2d 118, 121 (4th Cir.1991). Assuming he meets the other three prongs of the *McDonnell Douglas* test, a plaintiff who has failed to apply for a job may still carry his burden of proof if he can demonstrate that "he would have applied but for accurate knowledge of an employer's discrimination and that he would have been discriminatorily rejected had he actually applied." *Pinchback v. Armistead Homes Corp.,* 907 F.2d 1447, 1451 (4th Cir.1990). In such a case, a plaintiff is not required to subject himself "to the humiliation of explicit and certain rejection" and his unwillingness to engage in the futile gesture of formally applying for the position in question is excused. *United States v. Gregory,* 871 F.2d 1239, 1242 (4th Cir.1989); *see also International Bhd. of Teamsters v. United States,*

431 U.S. 324, 368, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (originating "futile gesture" doctrine).

■ There is no question that Brown failed to apply for the DCS position through the open competition process. Brown argues that this is not dispositive of the question, however, because he assumed he would automatically be considered for the DCS position because of the city's policy of placing laid-off workers on re-employment lists for equivalent positions. Brown apparently felt that it was therefore unnecessary for him to actively apply for the position.

Brown was not placed on the re-employment list for the DCS position, however. Two reasons have been advanced by the city for why Brown was never put on such a list: first, that because the DCS position was new, it had no corresponding re-employment list on which Brown could have been placed; and second, that such a placement was not appropriate because the DCS position encompassed responsibilities that had not been part of Brown's former job and in which he had no prior experience. We find it unnecessary to decide which of these explanations is correct. While it is true that the Civil Service Commission's placement of Brown on the re-employment list for the low-level position of Telephone Supervisor was inappropriate, there is no evidence that McLean played a role in or influenced the Civil Service Commission's action. In addition, Brown was aware, or should have been aware, of the inappropriate placement but did nothing to correct it. Shortly after his termination, Brown received a letter from the Civil Service Commission indicating that he had been put on the re-employment list for the Telephone Supervisor position. Brown testified that he did not know the exact nature of the Telephone Supervisor position, and that he continued to assume even after he had received the re-employment list letter that he would be considered for the DCS position.

While Brown perhaps could not have imagined that the Civil Service Commission would see fit to place him on a re-employment list for a position several rungs lower than the one from which he had been terminated, we cannot find that Brown applied for the DCS

position based on his mistaken assumption that he would automatically be considered for it. Even if there was a "re-employment list" for the DCS position, the position encompassed duties that had not been part of the Administrator of Telephone Facilities position that Brown had held. The Civil Service Commission therefore could have reasonably concluded that the DCS position was at a higher level and thus did not "reasonably approximate" Brown's abolished position.

Furthermore, even if Brown was not aware of the exact nature of the Telephone Supervisor position, it was clear when he received the letter stating that he was on the re-employment list for that job that it was not the DCS position, which was responsible for running the Municipal Post Office as well as the city telephones. In spite of this notice, Brown failed to question the Civil Service Commission about his re-employment list placement, or to check whether he was on a list for the DCS position. Because Brown failed to actively apply for the position through the open competition process or to request that the Civil Service put him on the list for consideration for the higherlevel position, we cannot find that Brown applied for the position in question.

■ We must next determine whether Brown's failure to apply for the DCS position is excusable. While Title VII does not require a plaintiff to apply for a job when to do so would be a futile gesture, a plaintiff claiming he was deterred from applying for a job by his employer's discriminatory practices has the burden of proving that he would have applied for the job had it not been for those practices. *Teamsters,* 431 U.S. at 368, 97 S.Ct. 1843. Brown has not met this burden. Brown does not contend that McLean's alleged discriminatory practices prevented him from applying for the DCS position. Rather, he failed to apply for the position on the false assumption that he would automatically be considered for it and that there was therefore no need for him to actively compete for the position. In addition, Brown's own testimony indicates that at his exit interview with McLean, she inquired whether he would be applying for the DCS position. Brown does not suggest, nor is there any evidence to

indicate, that this inquiry was in any way intended to discourage him from applying for the position or to suggest to him that any such application on his part would be met with certain rejection. *Cf. United States v. Gregory,* 871 F.2d 1239, 1241–42 (4th Cir. 1989) (excusing female plaintiff's failure to formally apply for deputy position because employer had explicitly stated he did not hire women deputies); *Holsey v. Armour & Co.,* 743 F.2d 199 (4th Cir.1984) (applying "futile gesture" doctrine when employer had no black employees in sales and had actively discouraged blacks from applying for sales jobs).

In sum, we find that Brown did not carry his burden of establishing a prima facie case of discrimination because he failed to apply for the position or to show that his failure to apply was based on his knowledge that to do so would have been futile. Accordingly, we affirm the district court's grant of judgment as a matter of law for the city on Brown's Title VII claim.

### III.

Brown next contends that the district court erred in denying his motion for partial summary judgment on his claim that the city's affirmative action plan constituted a race- and gender-based employment policy, practice, and custom, and in excluding evidence of the affirmative action plan at trial. Finding no error, we affirm the district court's summary judgment and evidentiary decisions.

### A.

■ Summary judgment is only appropriate when, viewing the evidence in the light most favorable to the nonmovant, there remains no genuine issue as to any material fact. *See* Fed.R.Civ.P. 56(c); *Henson v. Liggett Group Inc.,* 61 F.3d 270, 274 (4th Cir. 1995). We review the district court's grant or denial of summary judgment *de novo, see Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.,* 148 F.3d 417, 420 (4th Cir.1998).

■ Whether or not the city's affirmative action plan constituted an unconstitutional race- and gender-based employment policy,

practice and custom is only an issue if McLean's actions were taken pursuant to the plan. *See, e.g., Cerrato v. San Francisco Community College Dist.,* 26 F.3d 968, 976 (9th Cir.1994) (stating that common sense dictates "that the mere fact of an affirmative action plan's existence is not relevant to proving discrimination unless the employer acted pursuant to the plan"); *McQuillen v. Wisconsin Educ. Ass'n Council,* 830 F.2d 659, 666 (7th Cir.1987) (stating there was no need for court to address validity of affirmative action plan where plaintiff failed to establish causal connection between the plan and his hiring claim). There is here, however, no direct evidence that there was any nexus between McLean's actions and the existence of the city's affirmative action plan. Brown concedes as much, but suggests that one could reasonably infer a nexus because such a plan existed and McLean hired minorities. *See* Appellant's Brief at 35–37. This we cannot do at the summary judgment stage, where we must "draw all justifiable inferences in favor of the nonmoving party." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). For the purposes of Brown's motion for partial summary judgment, then, we must draw all inferences in favor of the city, as the nonmoving party. Accordingly, we must infer that McLean did *not* act pursuant to the city's affirmative action plan. It is therefore unnecessary for us to determine the validity of the city's affirmative action plan as a matter of law, and we affirm the district court's denial of Brown's motion for partial summary judgment on this issue.

### B.

■ Brown also argues that the district court should have admitted the city's affirmative action plan into evidence at trial. We review the court's decision to exclude evidence for abuse of discretion. *See Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1357 (4th Cir.1995).

The city filed a motion in limine with the district court seeking to prohibit Brown from introducing evidence of the city's affirmative action plan. The city argued that this evidence had no probative value because the

district court had not found the plan to be implicated in Brown's personnel action, and also maintained that introducing the plan would be prejudicial. J.A. at 91. The district court, without discussing upon which ground it was basing its decision, granted the city's motion.

As noted above, Brown argues that one could infer a nexus between McLean's actions and the city's affirmative action plan. We therefore hesitate to say that there was no probative value to introducing the city's affirmative action plan into evidence. Nonetheless, we cannot say that the district court abused its discretion in its apparent finding that the prejudicial value of admitting evidence of the affirmative action plan substantially outweighed its probative value, *see* Fed. R.Evid. 403, and we affirm the district court's decision to exclude it at trial.

### IV.

■ Brown maintains that the district court improperly dismissed McLean as a defendant in this case. In dismissing McLean, the district court relied on the reasoning in *Burtnick v. McLean,* 76 F.3d 611 (4th Cir. 1996), in which a panel of this court found McLean was entitled to legislative immunity in a related case raising the same issues that were on trial here. Brown contends that our *Burtnick* decision was in error and invites us to reconsider it here. We must decline to do so. Not only are we unable to overturn another panel's decision, *United States v. Guglielmi,* 819 F.2d 451, 457 (4th Cir.1987) (only an en banc court, not a subsequent panel, has authority to overturn a previous panel's published decision), but the record reflects that Brown failed to properly preserve this issue for appeal because he failed to make a timely objection to McLean's dismissal. Therefore, we also decline to consider this issue because it was raised for the first time on appeal. *See Karpel v. Inova Health Sys. Servs.,* 134 F.3d 1222, 1227 (4th Cir.1998) (issues raised for the first time on appeal generally will not be considered, unless refusal to consider the issue would be plain error or would result in a fundamental miscarriage of justice); *Muth v. United States,* 1 F.3d 246, 250 (4th Cir.1993) (same).

### V.

Brown also assigns other errors to the district court, none of which we find have any merit. He contends the district court's decision to exclude a number of exhibits was prejudicial error. Based on our review of the record, however, we cannot say that the district court abused its discretion in excluding this evidence.

■ Brown also argues that the district court erred in granting summary judgment against him on his sex discrimination claim. The district court dismissed this claim because Brown was replaced by a male. We affirm on the same ground. In order to make out a prima facie case of discriminatory termination, a plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Klein v. Derwinski,* 869 F.Supp. 4, 7 (D.D.C.1994). Although some courts have indicated that there may be exceptions to this rule in limited situations, such as in age discrimination cases where a plaintiff within the protected class is replaced by another, but significantly younger, person within the same class, *see, e.g., O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (holding in age discrimination claim that fact that plaintiff in protected class has been replaced by another person in protected class is irrelevant, so long as he has been replaced because of his age), where there has been a significant lapse of time between the plaintiff's application and its eventual decision to hire another individual within the same protected class, *see, e.g., Howard v. Roadway Express, Inc.,* 726 F.2d 1529, 1535 (11th Cir. 1984) (finding lapse of eleven months would significantly diminish reliability of subsequent hiring as indicator of employer's intent at time it rejected plaintiff's application and thus could not rule out inference of discrimination in connection with earlier denial of plaintiff's application), or where the employer's hiring of another person within the protected class is calculated to disguise its act of discrimination toward the plaintiff, *see, e.g.,*

*Jones v. Western Geophysical Co.,* 669 F.2d 280, 284–85 (5th Cir.1982). None of these exceptions are applicable here. Even if Brown had applied for the DCS position, the city hired another male for the position at the same time that Brown would have been considered for the position. Neither has Brown presented any evidence that the city's hiring of a male for the DCS position was designed to hide discrimination against Brown on the basis of his gender. Consequently, Brown has failed to establish a prima facie case of sexual discrimination, and we affirm the district court's grant of summary judgment on that claim.

## VI.

For the reasons given above, we affirm the district court in all respects.

*AFFIRMED.*

WILKINSON, Chief Judge, concurring in part and dissenting in part:

I would reverse the district court's grant of judgment as a matter of law on Ronald Brown's Title VII race discrimination claim.* Brown has adduced significant evidence that he was the victim of a systematic racial purge carried out by Jacqueline McLean shortly after McLean was elected Comptroller of the City of Baltimore in November 1991. At the very least, Brown deserves a trial.

On November 26, 1991, McLean, an African–American female, called Rudolph Koffler in the Bureau of Management Information Services and asked him for data on the name, address, race, and sex of each employee in the Department of the Comptroller. Based on this data, and on a visual inspection of the Department, McLean concluded that the office's "predominantly white male" status was unacceptable. She then pronounced that she did not want any pictures of white men on the walls of the Comptroller's office and ordered them removed. She later expressed doubts about the ability of a white male manager to serve and represent her or the people of the City of Baltimore.

The purported "reorganization" of the Comptroller's office was little more than a racial reshuffle. When McLean took office white men, including Brown, held three of the four highest civil service positions in the Department—Deputy City Auditor, Assistant Comptroller, and Administrator of Telephone Facilities. In 1992 McLean submitted a budget to the Board of Estimates that provided no funding for the three positions held by the white men. The budget created the seemingly parallel positions of Audit Manager, Administrative Officer III, and Director of Communication Services (DCS). On May 26, 1992, McLean informed Brown and the two other white male managers that their positions had been abolished pursuant to the "reorganization." The one position held by an African–American female, that of the Director of the Municipal Post Office, was left unchanged and fully funded. McLean insisted that she simply was following her transition team's suggestions. The transition team's report, however, recommended retaining Brown.

There is no evidence that Brown performed unsatisfactorily. On the contrary, the evidence shows that other governmental units around the state of Maryland adopted Brown's innovations. McLean herself complimented Brown on several of his cost-saving suggestions, telling him to implement them immediately. And she further informed him that she was satisfied with his work. A short time later, she recommended eliminating his position.

As a civil servant, Brown had a right to be placed automatically on the re-employment list for the job that most closely approximated his abolished position. Charter of Baltimore City art. VII, § 121. An employee on that list would have priority over all other applicants. However, Brown was not listed for the DCS job. Instead the Civil Service Commission placed Brown, who has an M.B.A. and twenty years of management experience, on the re-employment list for the position of Telephone Supervisor—in effect the position of a switchboard operator. Not only did the position require nothing more

* In all other respects, I would affirm the district court.

than a high school equivalency certificate, it had no vacancy.

McLean interviewed Rochelle Young, an African–American male, to fill the DCS position. Young possessed no municipal experience and no experience dealing with telephone company customers. What telephone experience he had was limited largely to equipment upkeep and development. McLean hired him anyway.

Brown's story was not aberrational. The City similarly failed to rehire the other employees whose jobs it abolished. The former Assistant Comptroller was considered but not hired for the parallel position of Administrative Officer III. The City ultimately listed him for an unavailable mid-level auditor position. McLean eventually filled the Administrative Officer III job with an African–American female. She justified her choice by insisting that no Caucasian could serve as her assistant. In addition, the former Deputy City Auditor was flatly told he could not apply for the parallel job of Audit Manager. Finally, McLean directed Allan Reynolds, the City Auditor, to fill one of the newly created Audit Manager positions with George Carter, an African–American, in the face of Reynolds' protests that Carter was less qualified than other non-minority candidates. McLean informed Reynolds that "her policy was to appoint black minority candidates to the maximum extent possible." According to Brown, by the time McLean left office, no Caucasians and only one male, Young, were left on the payroll of the executive office of the Comptroller.

In affirming the district court, the majority relies on Brown's failure to apply formally for the DCS position. Brown's failure to apply, however, poses no bar to his Title VII claim. First, no mechanism exists by which Brown could place himself on a re-employment list. *See* Baltimore Civil Service Rule 41(b) (leaving the decision to the Commission). Indeed, as noted, the City's charter automatically provided him with a right to be considered for the DCS job, rather than for a job as a switchboard operator. Consequently, a jury could well have found that Brown did all he had to do to apply for the DCS position.

Second, Brown presented sufficient evidence for a reasonable jury to find that applying was futile. He proffered a claim that he "would have applied [for the DCS job] but for accurate knowledge of [the City's] discrimination and that he would have been discriminatorily rejected had he actually applied." *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1451 (4th Cir.1990). Brown learned shortly before he received his re-employment list assignment that McLean had provisionally hired an African–American for the DCS job. That person moved into Brown's old office and assumed Brown's old duties. Similarly, Brown witnessed the elimination of civil service positions held by whites and "was convinced that ... because [he] was white" McLean would not hire him. In fact, McLean refused to re-hire one of the other white managers for the new Administrative Officer III position simply because he was white. Moreover, she told the third displaced manager not even to apply for the position most closely approximating his old job. Given such a pattern, Brown need not have subjected himself "to the humiliation of explicit and certain rejection." *United States v. Gregory*, 871 F.2d 1239, 1242 (4th Cir.1989).

The City asserts that McLean's behavior and the Commission's failure to list Brown properly were unconnected. Consequently, it maintains, McLean's motivation is irrelevant to the Commission's incorrect listing of Brown. A court ought not indulge this bureaucratic shell game. If the Commission had listed Brown properly, he would have assumed the DCS position—a result that would have placed him back in close proximity to McLean. That the Commission would be unaware of McLean's agenda, especially in the face of her racially charged public pronouncements, is highly unlikely. When a prominent elected official dismisses an employee under circumstances such as these, it is far-fetched to assume that the Commission would defy her wishes by simply rehiring him.

In effect, the City is asking this court to review Brown's claim while covering one eye and squinting with the other. In ceding to McLean's wishes, the Commission failed even

to follow its own procedures. For instance, the Commission did not perform a field audit on McLean's suggested reorganization. A field audit would have involved interviewing Brown; the Commission failed even to contact him. Similarly, the Commission followed orders to keep the reorganization a secret from Reynolds despite the fact that city protocol required that he be notified.

The rule of law should not turn on which race is burdened or benefitted by this sort of conduct. *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Here, McLean's decision allegedly worked to the advantage of African–Americans. In other offices, under other managers, however, racial decisions will just as wrongly work to their detriment. According to McLean, "I needed someone to represent me. I am black. I don't think [a white male manager] would even be able this day to be able to represent me in front of my community...." Apparently, McLean thought one-race policies were just good politics. Unfortunately, "good politics" has often been used in our sad past to sow racial division. "[A] free people whose institutions are founded upon the doctrine of equality should tolerate no retreat from the principle that government may treat people differently because of their race only for the most compelling reasons." *Id.* (internal quotation marks omitted). No such reason exists in this case.

Racial pogroms in the workforce have no place in our country. Brown should be allowed to say that he had performed capably as Administrator of Telephone Facilities for many years, that he was the most qualified person for the DCS position, and that he was not rehired for that position for no reason other than his race. And a jury should be allowed to conclude that such treatment of him violates the core mandate of Title VII.