**Larry M. BROWN**

v.

**HOUSING AUTHORITY OF CALVERT COUNTY, et al.**

**Civ.A. No. DKC 99–2254.**

United States District Court, D. Maryland.

July 20, 2001.

H. Vincent McKnight, Jr., Law Office, Washington, DC, for plaintiff.

Shirlie N. Lake, R. Scott Krause, Eccleston & Wolf, P.C., Baltimore, MD, for defendants.

## *MEMORANDUM OPINION*

CHASANOW, District Judge.

Pending and ready for resolution in this employment discrimination action is the motion for summary judgment by Defendants Housing Authority of Calvert County (the "Housing Authority"); the "Office of the Executive Director;" Diane Herrmann, Housing Authority director of rental services; and the following members of the Housing Authority Board of Commis-

sioners: Spike W. Parrish; Judith T. McManus; the Rev. Aniachi C. Belu–John; Joseph P. Danahy; and Patricia A. Starliper.[1] Plaintiff asserts claims under 42 U.S.C. §§ 1981 and 1983 and Article 24 of the Maryland Declaration of Rights. No hearing is deemed necessary, and the court now rules pursuant to Local Rule 105.6. For the following reasons, the court shall GRANT Defendants' motion.

## I. Background

The following facts are undisputed or presented in the light most favorable to Plaintiff, Larry M. Brown. On June 4, 1996, Plaintiff was hired by then Housing Authority Executive Director Michael Lundy under a one-year contract as a Family Self–Sufficiency Coordinator ("FSS Coordinator"). The FSS program is federally funded and designed to aid Housing Authority clients attain self-sufficiency through the establishment of set goals, such as education and employment, with the ultimate goal being home ownership. The overwhelming majority of FSS program participants are African American.

The FSS Coordinator reported directly to the executive director during Brown's tenure at the Housing Authority. Until Lundy resigned, Brown reported directly to him. After Lundy's departure, Parrish, vice chair of the Housing Authority Board, volunteered as executive director and instructed Brown to report to Herrmann, director of rental services. According to the Housing Authority organizational chart, the FSS Coordinator was directly under the director of rental services. However, Herrmann told Parrish that she would rather not supervise Brown. In his deposition, Brown testified that he, in fact,

reported to Parrish and not to Herrmann. Herrmann also did not supervise Brown's predecessor, Carol Kalen, but admits that she does supervise Brown's successor, Amy Crisp, an African American. Margaret Reilly assumed the role of executive director after Parrish, and Plaintiff then reported to her.[2]

Plaintiff alleges that while at the Housing Authority, he was the victim of racial harassment because he did not have an office, was subjected to racial comments, and was denied training opportunities. When Plaintiff was hired, Lundy informed him that his office would be in Calvert Pines II, a senior residential facility, located apart from the Housing Authority's main office. Brown states that Lundy and another employee, Mary Stinnett, had informed him that his predecessor had an office at Calvert Pines II. Brown also saw FSS materials in the desk at the Calvert Pines II office. The former FSS Coordinator also worked at the administrative office, and either used the conference room or the offices of other staff members when they were not being used.

Once Parrish learned that Brown was working at Calvert Pines II, he informed Lundy that Brown had to move to the Housing Authority's main administrative facility, because Housing Authority policy precluded FSS/"Section Eight" clients from being interviewed at Calvert Pines II. Brown states that he did not know whether his predecessor ever interviewed clients at Calvert Pines II, and Parrish asserts that even if Brown's predecessor used the office at Calvert Pines II, it was without his knowledge.

---

1. Plaintiff sues the individual Defendants in their individual and official capacities.

2. Reilly died after this suit was filed, but before depositions were taken. Evidentiary issues due to her unavailability are discussed later.

At the main facility, Brown was allowed to use the executive director's office after Lundy resigned in late June 1996, and until Reilly assumed the executive director position on September 23. Brown was then moved to the conference room, which also served as a meeting place and lunch room for all staff. Brown complained about the fact that he did not have an office. Reilly invited Plaintiff to use her office for client meetings, but he states the one time he did, her desk was covered with papers. He admits that he never discussed with her the possibility of removing the papers in the future or otherwise clearing a space on her desk.

Plaintiff also alleges that other employees, including Herrmann, made racially derogatory comments about black tenants. Before Reilly was hired, Plaintiff complained about these comments to Parrish, who acknowledged the problem but instructed Plaintiff to wait until a new executive director was hired. Plaintiff later complained about these comments to Reilly. Finally, Plaintiff also alleges as part of his racial harassment claim that he was denied two training opportunities.

Plaintiff also claims that despite his excellent performance, he was fired, and attributes his discharge to his race. While at the Housing Authority, Plaintiff increased FSS program enrollment from 13 to 28 clients. Had he not increased enrollment to at least 25 participants, the FSS program could have lost its funding. Plaintiff also organized the first "formal" FSS Coordinating Committee meeting, and received compliments from Lundy and Parrish on his work performance.

Although Plaintiff admits that he reported to Reilly after she became executive director, he claims that Herrmann, as his supervisor, had control over his employment and played a role in his discharge. As evidence of Herrmann's influence, he contends that Herrmann told Reilly that she and Plaintiff did not get along, and that Herrmann also socialized with board members, who agreed with Reilly's decision to fire him.

During a three-week period beginning in September, Reilly called Housing Authority Board Chairperson Judith T. McManus several times to discuss problems she was having with Plaintiff. She complained that he resisted giving her certain FSS program information and that he had problems with accountability and productivity. Plaintiff was often out of the office, and Reilly asked him to provide her a calendar of his whereabouts and phone numbers where he could be reached. Plaintiff states that whenever he left the office, he would tell the secretary where he was going and when he would return. Reilly eventually told McManus that she felt terminating Plaintiff was the only solution. McManus told her that as executive director, it was her decision.

## II. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co., Inc. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139, 141 (4th Cir.1979); *Ste-*

*vens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue of material fact. Fed. R.Civ.P. 56(c); *Pulliam,* 810 F.2d at 1286 (citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 437 (4th Cir. 1998). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

In *Celotex,* the Supreme Court stated:

In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories,

and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 632 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. Analysis

### A. 42 U.S.C. § 1983 claims

Defendant contends that Plaintiff is barred from asserting § 1983 claims of racial harassment and discriminatory termination, (counts II and IV, respectively), in violation of his constitutional rights to equal protection, because he failed to exhaust his administrative remedies under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Plaintiff argues that whether a plaintiff who fails to bring a Title VII action is precluded from bringing a § 1983 suit is an open question in this circuit, and that the Fourth Circuit previously has held that a § 1983 claim is not precluded by the existence of Title VII.[3] Although the § 1983 claims are for all practical purposes duplicative of the § 1981 claims in this case, the court will address the procedural question first.[4]

---

**3.** Plaintiff also argues that the Supreme Court has long held that claims brought under Title VII and 42 U.S.C. § 1981 are distinct. However, Defendants do not challenge Plaintiff's

right to bring claims under § 1981 due to his failure to bring a Title VII action.

**4.** While the court addresses the § 1983 procedural issue, it does not reach other arguments

In *Hughes v. Bedsole,* 48 F.3d 1376 (4th Cir.1995), the Fourth Circuit held that the plaintiff could not bring a sex discrimination suit pursuant to § 1983 after she had the opportunity but failed to institute a Title VII cause of action. In that case, the plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC"), which issued her a right to sue letter. *Id.* at 1383 n. 6. The plaintiff failed to file her civil action within the time designated in the notice, and the Fourth Circuit held that this failure foreclosed her ability to bring a suit under § 1983. *Id.* (citations omitted).

As Plaintiff points out, the Fourth Circuit had reached a different result from *Hughes* in the earlier case of *Keller v. Prince George's County,* 827 F.2d 952, 953 (4th Cir.1987), in which the plaintiff, after exhausting her Title VII administrative remedies, brought race discrimination claims under that statute and § 1983. The district court granted summary judgment as to the plaintiff's § 1983 claims, finding that Title VII provides the exclusive remedy for charges of employment discrimination against a state employer. *Id.* The Fourth Circuit reversed, holding that Title VII does not preempt similar claims brought pursuant to § 1983.

One obvious distinction between *Keller* and *Hughes* is that in the latter, the plaintiff could have but failed to institute an action under Title VII, while in the former, the plaintiff brought causes of action under both statutes. Despite this difference, at least one other court in this district that has addressed this issue, found that *Keller* and *Hughes* conflict. *Burtnick v. McLean,* 953 F.Supp. 121, 123 (D.Md.1997) (explaining that in *Hughes,* the Fourth Circuit "abandoned [the holding in] *Keller* altogether;" and that these two conflicting panel decisions can be resolved only by that court *en banc* ). The court in *Burtnick* felt compelled to follow *Hughes* as it was the latest pronouncement from the Fourth Circuit. *Id.*

■ This court also feels compelled to follow *Hughes,* the Fourth Circuit's latest ruling on this issue. Moreover, the facts in *Hughes* and this case are indistinguishable. The EEOC issued Brown a right to sue notice on March 23, 1999. Just like the plaintiff in *Hughes,* it is undisputed that Brown failed to institute a Title VII civil action within 90 days of receiving the notice, as he was directed. He is thus precluded from bringing § 1983 racial harassment and discriminatory termination claims in this court, and summary judgment is granted as to counts II and IV.[5]

### B. Racial Harassment

■ Plaintiff claims he was subjected to racial harassment in violation of 42 U.S.C. § 1981 and Maryland's state constitution. Both claims may be analyzed under the same standards developed in Title VII harassment cases. *Causey v. Balog,* 162 F.3d 795, 804 (1998) (federal constitutional

---

Defendants raise regarding claims against the individual Defendants as all Plaintiff's claims fail for other reasons discussed later.

5. Defendants also contend that Plaintiff is barred from bringing state constitutional claims under the Maryland Declaration of Rights for the same reason his § 1983 claims are barred. However, the plaintiff in *Hughes* also asserted discrimination claims under the state constitution. 48 F.3d 1376 n. 6. The

Fourth Circuit refused to address those claims, not because Plaintiff had failed to institute a cause of action under Title VII, but because under North Carolina law, a plaintiff may pursue an action directly under the North Carolina Constitution only in the absence of an adequate state remedy, which the court found existed. *Id.* (citations omitted). Defendants do not argue that under Maryland law, Plaintiff faces a similar obstacle.

claims brought pursuant to § 1983 and § 1981 claims are analyzed under Title VII proof scheme) (citing *Gairola v. Virginia Dept. of General Services*, 753 F.2d 1281, 1285 (4th Cir.1985)); *Murphy v. Edmonds*, 325 Md. 342, 354–55, 601 A.2d 102, 108 (1992) (Maryland courts consistently have taken the position that the Maryland equal protection principle under article 24 of the Maryland Declaration of Rights "applies in like manner and to the same extent as the Equal Protection Clause of the Fourteenth Amendment") (citations and internal quotation marks omitted).

▬ To survive summary judgment on a Title VII racial harassment claim, Plaintiff must show that a reasonable jury could find Defendants' actions were (1) unwelcome; (2) based on race; and (3) severe or pervasive enough to alter the conditions of his employment and create an abusive atmosphere. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir.2001) (citation omitted). Plaintiff must also show that there is a basis for imposing liability on the Housing Authority. *Id.* To determine whether the degree of hostility or abuse to which Brown was exposed was sufficiently severe or pervasive to alter the conditions of his employment, the court must examine the totality of the circumstances, including (1) the frequency of the conduct; (2) whether it was physically threatening or humiliating, or a mere offensive utterance; and (3) whether it unreasonably interfered with his work performance. *Id.* Plaintiff must also subjectively have perceived his workplace to be abusive. *Id.* In examining the totality

of the circumstances, the court can consider conduct targeted at those other than Plaintiff, and the racial hostility in the office before he entered into it. *Id.* at 184 n. 5 (court may consider the "lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs") (citation omitted). However, "second hand harassment" is obviously not as great as the impact of harassment directed at the plaintiff. *McPhaul v. Bd. of Commissioners of Madison County*, 226 F.3d 558, 567 (7th Cir.2000) (citation omitted).[6]

Plaintiff alleges that he was subjected to a racially hostile work environment in the form of various racial slurs and derogatory comments and by Defendants' failure to provide him an office or send him to training. Defendants contend that Plaintiff's claims fail because he has not shown that any comments made were objectively severe or pervasive enough to alter the conditions of his employment and because they have advanced non-discriminatory reasons for Plaintiff's failure to obtain an office or attend training. Defendants also appear to argue that Plaintiff has failed to show the Housing Authority had sufficient notice of any alleged harassing behavior to be held liable. Plaintiff argues that for his claim to survive he does not have to show that the comments were directed at him, and that there is sufficient evidence of notice to the Housing Authority to hold that entity liable.

### 1. *Derogatory comments*

▬ To support his racial harassment claim, Plaintiff principally relies on the

---

**6.** Plaintiff misplaces reliance on *Childress v. City of Richmond*, 120 F.3d 476, 478 (4th Cir.1997), *vacated and aff'd. by an equally divided court*, 134 F.3d 1205 (4th Cir.1998), in which a panel of the Fourth Circuit held that white male officers, who alleged that their supervisor made derogatory comments about black and female officers stated a harassment

claim. Plaintiff cites this case for the proposition that comments directed at the rental services clients support his racial harassment claim. However, the panel decision was vacated by the Fourth Circuit *en banc*, which upheld the district court's dismissal of the white officers' claims by an equally divided court. *Id.* at 1207.

following statements he contends Housing Authority employees made regarding FSS program participants:

(a) "We should take all of these Section 8 clients, put them in a boat and send them to China," and "A country that takes care of its poor can never be strong," made in Plaintiff's presence by Dianne Herrmann and Bonnie Burris, respectively, at a July 11 staff meeting;

(b) "The senior housing residents should be allowed to pay their monthly rent by personal check, while the public family housing residents would only be allowed to pay their monthly rent by either cash or money order," made in Plaintiff's presence by Herrmann at a July 16 staff meeting;

(d) "Who do these black niggers think they are?" and "I'm so tired of those nigger bitches," made by Herrmann on July 19 and August 15, respectively, while in her office; Plaintiff was present on both occasions;

(e) The FSS "program is going nowhere because those people do not want to do anything," made by Herrmann on July 25 at a restaurant in Plaintiff's presence;

(f) "Those Section Eight people want something for nothing. I'm doing them a favor, [and] they better stay on my good side," made at an October 1 staff meeting by Burris, in Plaintiff's presence;

(g) "It would be nice if we could shut off the water in Section Eight housing to save the county some money," made by Michael Hall on October 2 in Plaintiff's presence; and

(h) "I am not a babysitter or social worker," and in reference to the Million Man March, "It would be a great time to kill a million niggers," made by Herrmann on October 16, 1995 and March 15, 1996, respectively, before Plaintiff began working with the Housing Authority. In addition to these comments, Plaintiff also relies on deposition testimony by Janet Miller, who served as a financial specialist for the Housing Authority, that during her 14-year tenure at the agency, she heard "racial remarks" from unidentified employees.

Apparently, Plaintiff subjectively felt his workplace was abusive as he complained about some of these comments to Parrish and Reilly. Parrish told him to wait until Reilly was hired and then she would address them. While Reilly did advise staff to be more sensitive, she did not organize a sensitivity training seminar as Plaintiff had suggested. However, examining these remarks as a whole, the court finds that they were not objectively severe or pervasive enough to alter the conditions of Plaintiff's employment. Despite the fact that all comments were made about FSS or Section Eight housing clients, the overwhelming majority of whom were African American, the remarks by Burris and Hall and most of the remarks by Herrmann, were not facially racist. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("mere utterance of an epithet which engenders offensive feelings in a[n] employee ... does not sufficiently affect the conditions of employment to implicate Title VII.") (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

While the court can consider events that occurred before Plaintiff was introduced into the environment, he only points to two comments specifically that someone else told him Herrmann made to support his claim. In addition, although Miller testified that she had heard people make racial remarks over the course of her 14 years at the agency, she could not recall what they were or who made them. *See Hall v. FlightSafety Int'l, Inc.*, 106 F.Supp.2d 1171, 1191 (D.Kan.2000) (evidence of "isolated, non-threatening remarks made by

known or unknown coworkers" was insufficient to state a racial harassment claim).

Plaintiff's main problem was with Herrmann. He claims that she constantly made discriminatory remarks about the rental service program clients, most of whom were African American. Specifically he points only to the seven comments she made that are listed above, most of which were no more than offensive utterances. On two instances, however, she allegedly used the word "nigger" in his presence, in reference to FSS program participants, and once before he started working at the Housing Authority in reference to participants at the Million Man March. The Fourth Circuit recently held that the word "nigger" is far more than a mere offensive utterance. *Spriggs*, 242 F.3d at 185 (explaining that the word "is pure anathema to African Americans") (internal quotation marks omitted). While Plaintiff claims he was humiliated at hearing this word, he fails to show that Herrmann's use of that word was more than sporadic or that any of the comments made affected his work performance. *See McPhaul*, 226 F.3d at 567 (although she pointed to three occasions in which a white coworker used the word nigger, plaintiff failed to show she was subjected to a hostile work environment, as she did not, *inter alia*, claim the remarks interfered with her work performance). In this case, Plaintiff admits in his deposition that any comments he may have heard did not affect his work performance, and that his work was "outstanding" until after his November 19 meeting with Reilly, during which she informed him that his last day would be December 2. It was only after that meeting, and not as a result of any of the comments from staff members, that he claims he was unable to perform his job effectively. Hall's comment on October 2 was the last derogatory comment Plaintiff claims was made. Thus, by his own admission, well over a month after he heard the last remark, his job performance was still "outstanding."

Moreover, he admits that none of these comments were directed at him. As already explained, the impact of second hand harassment is not as great as the impact of harassment directed toward the plaintiff.

Plaintiff simply has failed to allege sufficient facts or present evidence that these comments were severe or pervasive enough to support a racial harassment claim. *Cf. Spriggs*, 242 F.3d at 185 (plaintiff stated actionable racial harassment claim as defendant, *inter alia, habitually* uttered vulgar, racist remarks either at him or at others while in his presence); *Hall*, 106 F.Supp.2d at 1191 ("to constitute an actionable claim for hostile work environment, a plaintiff must be subjected to a steady barrage of opprobrious racial comments; ... isolated incidents of racial enmity or sporadic racial slurs is insufficient") (citation and internal quotation marks omitted).

### 2. *Plaintiff's lack of office space*

Plaintiff also attempts to support his hostile work environment claim by showing he was denied an office. In order to do so, however, he must show that he was not provided an office because of his race. *Spriggs*, 242 F.3d at 183 (Defendant's action must be based on race); *Hawkins v. Pepsico*, 203 F.3d 274, 281 (4th Cir.2000) (plaintiff's hostile work environment claim failed as she was unable to show the problems about which she complained, for example, allegedly receiving inadequate coaching and having to do the work "over and over," were "racial in nature").

Plaintiff claims that Defendants' refusal to provide him an office was racially motivated because: (1) Kalen, his Caucasian predecessor, had an office, while he did

not; and (2) none of his non-minority "counterparts" at the housing authority during his tenure was without an office.

### a. *Kalen's use of the office at Calvert Pines II*

When Plaintiff was hired, then executive director Lundy allowed him to use an office at Calvert Pines II, a senior facility, located apart from the Housing Authority's administrative offices. Lundy stated in his deposition that he identified office space at Calvert Pines II for Plaintiff's predecessor. Mary Stinnett, another Housing Authority employee, told Plaintiff that his predecessor also used office space in Calvert Pines II, and when he started, Plaintiff noticed FSS materials in the desk at the Calvert Pines II office. Further, Wayne Boyle, current Housing Authority executive director, stated that he saw Plaintiff's predecessor twice at Calvert Pines II watching soap operas in the recreation room.

However, according to Parrish, vice chair of the Housing Authority Board, because Calvert Pines II was a senior residence facility, FSS and public housing clients could not be serviced there. Once Parrish learned that Plaintiff was using the Calvert Pines II facility to interview clients for the FSS program, he told Lundy to have him move to the Housing Authority's main administrative office. Even assuming Plaintiff's predecessor used the office at Calvert Pines II, it is uncontradicted that Parrish did not know about it. Thus, Plaintiff has not shown that he was treated any differently than his predecessor. Lundy allowed both of them to use the office at Calvert Pines II. It was only after Parrish learned about this, which was during Plaintiff's tenure, that he told Lundy the FSS program had to operate out of the main administrative facility. Thus, Plaintiff fails to present any evidence to support his claim that he was deprived of

an office at Calvert Pines II because of race.

### b. *Defendants' failure to provide Plaintiff an office at the administrative office*

Once Plaintiff moved to Housing Authority headquarters, Lundy resigned and Parrish volunteered as interim executive director. During this time, and until Reilly was hired, Parrish worked out of a conference room, and Plaintiff used the executive director's office. Parrish also advised Plaintiff that the Housing Authority would most likely move into a larger facility and that he intended to have an office constructed for the FSS program. Plaintiff admits that he was eventually told those plans fell through.

Two days before Reilly started, Parrish told Plaintiff that he would have to use the conference room as his office. It is undisputed that the conference room was less than an ideal work space. It was not ventilated and also served as the staff lunch room. Plaintiff states that there were available offices to use, and that he could have shared an office with others, particularly, the maintenance staff, who were often out of the building. However, there is no evidence that there were any vacant offices for Plaintiff to use. In fact, had there been one, Parrish most likely would have used it instead of working in the conference room before Reilly was hired. As for sharing office space, Parrish explained that he felt an office sharing arrangement would have been bad for morale. Paper no. 47, Plaintiff's exhibit 1 at 391.

Plaintiff also complained to Reilly about his lack of office space, and at her suggestion, he wrote her a memorandum expressing his concerns on October 23. He admits that she responded with a memorandum of her own on October 28, but

states that the content of that document, which Defendants attach as an exhibit, is inadmissible hearsay.

However, even if the court does not consider this memorandum, it does not aid Plaintiff's case because he offers no evidence that race played a role in his not having an office.

While Plaintiff claims that his "non-minority counterparts" did not have to endure "[t]his unprofessional office space assignment," he fails to explain what he means by "counterparts." There is no evidence that there were other one-year contract employees working at the Housing Authority, let alone any who had offices, singly or shared. Moreover, there is no evidence that Plaintiff's predecessor had an office at the Housing Authority. Although his predecessor used office space at Calvert Pines II, it is undisputed that at times, she also worked at the Housing Authority's administrative office, and when there, she did not have her own office or share one. Parrish testifies that, like Plaintiff, the former FSS Coordinator worked out of the conference room. Boyle states that Plaintiff's predecessor used the conference room or other people's offices when they were free. Herrmann corroborates this testimony. She states that Plaintiff's predecessor worked out of a box or the offices of others when they were not being used. Plaintiff does not argue that Defendants failed to give him the same opportunity. Reilly told Plaintiff that he could use her office when it was not being used. He states that he tried once but saw a mass of papers on her desk, which he did not feel comfortable moving. He fails to explain why he did not use another area in her office, and admits that he never asked her to remove the papers or, despite her offer, attempted to use her office again. Amy Crisp, Plaintiff's successor, also was placed in the conference room until an office was eventually built for her. While Plaintiff's conference room office was undoubtedly inconvenient, he fails to show that this situation had anything to do with race.

### 3. *Denial of Training*

Finally, Plaintiff claims that he was denied two training opportunities because of race, which he claims contributed to his hostile work environment. Plaintiff requested to attend the 1996 "MAHRA" fall conference in Hagerstown, Maryland and the Nan McKay conference in Philadelphia. Reilly denied both requests. Plaintiff again fails to show that race motivated these decisions. In an October 25 memorandum to Plaintiff, Reilly offered legitimate, non-discriminatory reasons for denying his requests. Plaintiff argues that the court cannot consider this evidence because it is hearsay, and Defendant offers numerous reasons why under various hearsay exceptions this memorandum and others by Reilly are admissible. However, the court need not delve into those arguments because it is not focusing on these materials for the truth of the matter asserted in them, see FedR.Evid. 801(c) (explaining that " '[h]earsay' is a statement . . . offered in evidence to prove the truth of the matter asserted"), but rather to determine whether race or some other reason motivated Reilly's refusal to allow Plaintiff to attend training, see e.g., Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1423 (10th Cir.1991) (explaining that an exhibit that showed a cost savings by hiring newer employees over retaining those with greater seniority was not hearsay in age discrimination case; document was offered not for its truth, but to show defendant's motivation during its reduction in force). Four employees were slated to attend the "MAHRA" conference before Plaintiff requested to attend. Reilly initially explained that because four employ-

ees were already slated to attend, sending him would be too costly. Only two employees eventually attended. Plaintiff claims that Reilly's excessive cost reason was pretextual because two employees who were slated to attend did not, and thus he could have taken one of their slots. However, in her MHRC interview notes, attached as Plaintiff's exhibit 3, Reilly explains that she felt the two employees who did attend sufficiently represented the Housing Authority's interest. Defendants have provided evidence that race did not motivate Reilly's decision. While Plaintiff argues that he believes cost was "probably a disguise" for why he was not allowed to attend this training, he also stated in his deposition that he did not believe the real reason was because of race. Plaintiff cannot now be heard to argue to the contrary.

Likewise, Reilly again cited cost as the reason for not allowing Plaintiff to attend the Nan McKay conference in Philadelphia. She also told Plaintiff that she expected that the conference would be repeated locally, and gave him permission to purchase the book from that conference. Plaintiff presents no evidence that race as opposed to these reasons motivated Reilly's decision, and his claims fail.[7]

### C. Termination

Plaintiff alleges that Defendants terminated him because of his race, in violation of § 1981 and the Maryland Declaration of Rights. As already explained, these claims may be analyzed using the burden of proof scheme in Title VII cases. Defendants assert that Plaintiff fails to establish a prima facie case of discriminatory termination because he was replaced by an Afri-

can American. Defendants also assert that Reilly had sole authority to fire Plaintiff and did so for numerous reasons, including lack of accountability and productivity. In response, Plaintiff argues that the fact he was replaced by an African American is not fatal to his claim, and that Defendants' evidence regarding their reasons for his discharge is inadmissible hearsay. Assuming Defendants' evidence is admissible, Plaintiff argues that he has introduced sufficient evidence to show their reasons are pretextual. Plaintiff also appears to argue that Defendants' intent to discriminate against him may be inferred from discrimination directed at other African Americans.

 Plaintiff presents no direct evidence of discrimination and the court analyzes his claims under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case of discriminatory termination, Plaintiff must show that (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) at the time he was discharged, he was performing at a level that met his employer's legitimate job expectations; and (4) the position remained open to or was filled by similarly qualified applicants outside of his protected class. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir.1999) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir.1998); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455 (4th Cir.1989)); *see also Barbara Linderman & Paul Gross-*

---

7. Plaintiff also argues in his memorandum that Herrmann supervised his predecessor but refused to supervise him because he is black. There is no evidence to support this claim. Herrmann testified in her deposition that she did not supervise Plaintiff's predecessor. Further, it is undisputed that Herrmann currently supervises Plaintiff's successor, who is also African American.

man, Employment Discrimination Law 847 (Paul W. Cane, Jr. et al. eds.3d ed.1996) (1976) (listing employee being replaced by a person outside his or her protected group as fourth element in a discriminatory discharge action). Once a Plaintiff establishes a prima facie case, the Defendant must present a legitimate, non-discriminatory reason for the adverse employment action alleged. *Brinkley,* 180 F.3d at 607. Plaintiff retains the ultimate burden of proving by a preponderance of the evidence that the real reason for the employment decision at issue was unlawful discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000).

█ The Fourth Circuit has held that a plaintiff's prima facie case ordinarily fails in a discriminatory discharge case when he or she is replaced by a member of his or her protected group. *Brown v. McLean,* 159 F.3d 898, 905 (4th Cir.1998) (citations omitted). The court in *Brown* did note that other courts have recognized limited exceptions to this rule, such as: (1) in age discrimination cases, where the plaintiff is replaced by a significantly younger person, who is also in the plaintiff's protected age group; (2) in a failure to promote context, where there has been a significant lapse in time between the plaintiff's application and the defendant's decision to hire another individual in the same class; or (3) where the employer's hiring of another person within the same class was a disguise for unlawful discrimination against the plaintiff. *Id.* (citations omitted). The first exception does not apply to this case, and Plaintiff has failed to show that there was a significant lapse of time between his being discharged and his successor being

hired. He also does not argue that his successor was hired as a disguise to mask unlawful discrimination against him. *See Brown,* 159 F.3d at 906 (plaintiff presented no evidence that Defendant attempted to cover up discrimination against him by hiring replacement who belongs to the same protected group).

█ Plaintiff also cites several old district court cases from other circuits that held that replacement by a member of the same protected group is not fatal to a Plaintiff's Title VII claim.[8] Those cases are unavailing to the extent they are inconsistent with cases from this circuit that have interpreted the *McDonnell Douglas* burden shifting scheme. As already explained, with very limited exception, a plaintiff must show he was replaced by a person outside of his or her protected group to establish a prima facie case. Nevertheless, even assuming Plaintiff establishes a prima facie case, he fails to rebut Defendants' non-discriminatory reasons for his discharge.

The record is clear that as executive director, Reilly had authority to fire Plaintiff, although she consulted with the board in making her decision. Plaintiff argues that Herrmann played a role in his discharge. In his complaint, he alleges that Herrmann was his direct supervisor, which "gave her substantial direct authority over" his employment. However, beyond bald assumptions, Plaintiff offers no other support that Herrmann played a role in his discharge. Plaintiff admits that Herrmann never supervised him, and that during his tenure at the Housing Authority, he reported to Lundy, Parrish and Reilly. Herrmann did state in her MHRC interview notes that she told Reilly and Parrish

8. *Equal Employment Opportunity Commission v. Tufts Inst. of Learning,* 421 F.Supp. 152 (D.Mass.1975); *Townsend v. Exxon Co.,* 420 F.Supp. 189 (D.Mass.1976); *NAACP v. City of Corinth,* 83 F.R.D. 46 (N.D.Miss.1979).

that she did not get along with Plaintiff. She also told Reilly that Plaintiff would not communicate with her. Reilly never stated, however, that Herrmann ever asked her to fire Plaintiff or that they even talked about it. Plaintiff points out that Herrmann and Parrish socialized together, but again fails to provide evidence that they discussed Plaintiff's termination. Finally, in his deposition, Plaintiff admits that he does not know whether Herrmann ever spoke with Reilly about his work or the FSS program but only "speculates" that she did. Thus, Plaintiff admits that there is no evidence Herrmann spoke with Reilly or anyone else about his performance or terminating him.

Moreover, the evidence is overwhelming that, as executive director, Reilly was given authority over Housing Authority staffing decisions. McManus, chairperson of the Housing Authority Board, testified at her deposition that the hiring and retention of the executive director was the only staffing decision the board made, and that the executive director was charged with decisions regarding Housing Authority staff. McManus stated that over a three-week period beginning in September, Reilly called her about concerns regarding Plaintiff's productivity and accountability. By the third conversation, Reilly informed her she felt terminating him was the only solution. McManus advised Reilly to keep the board apprised of her decision, which she did. Plaintiff produces no evidence that it was anyone else's decision but Reilly's to fire him. He merely points out that Reilly spoke with McManus about his termination, and either discussed or attempted to discuss her decision to terminate him with other board members, who concurred with her decision.

According to the MHRC's written findings, Reilly fired Plaintiff for lack of productivity and less than satisfactory performance. She noted that his monthly reports were vague, meaning they lacked conclusions and that he would not inform her of certain program statistics, such as the number of clients enrolled and employed. She stated that despite repeated requests, he refused to merge his client files with others to create a master file, which she claimed would "facilitate the federal monitoring review process." Further, she stated that he was often out of the office, and that she had asked him to leave a calendar with his appointments and phone numbers where he could be reached, which he refused to do. McManus verified much of this information in her deposition. She stated that in their telephone calls, Reilly would complain about Plaintiff's "accountability, resistance in getting information, [and] in communicating[,] which ... she [Reilly] felt was a direct impact on his ability to be successful and productive in the program."

Plaintiff points out that under his direction, the FSS program increased enrollment from 13 to 28 clients and that he organized the first "formal" FSS Coordinating Committee meeting, where everyone "committed" to the FSS Program met and discussed the program. Further, Lundy thought Plaintiff performed well, and at the FSS Coordinating Committee meeting, Parrish commended Plaintiff for the good job he was doing. Plaintiff also claims that two weeks after Reilly became executive director, she praised him for his "outstanding job," but the record is devoid of any such statement. He also states that "half the time," he would leave the office right after coming in, but would inform the secretary where he was going and when he would return.

Even assuming the truth of these facts, Plaintiff fails to address claims that he repeatedly refused to merge files, submit-

ted less than adequate reports and failed to provide Reilly a calendar of his schedule and telephone numbers of where he could be reached. Further, despite Parrish's praise, as already explained, it is clear that the board had given authority regarding staffing decisions to Reilly. Plaintiff presents no evidence that Parrish was familiar with the day-to-day goings on in the office after Reilly became executive director.

Plaintiff also argues that McManus and other board members failed to question Reilly about her concerns regarding his lack of productivity. However, this supports Defendants' position that the decision to fire Plaintiff was really Reilly's to make, although she informed the board of her decision, to which they agreed.

Plaintiff further contends that discriminatory intent regarding his termination may be inferred from several incidents: (1) he told Reilly on October 7 that he heard Herrmann make an offensive remark; (2) Lundy told him that he had complained to the board about Herrmann's racist remarks; (3) Reilly failed to institute sensitivity training despite hearing derogatory comments about Housing Authority clients in staff meetings; (4) Herrmann made racially derogatory comments about clients; and (5) Lundy's contract was not renewed despite his "impressive" job performance. There is not a shred of evidence that any of these comments or actions were related to the employment decision at issue, and thus cannot serve as evidence of discriminatory discharge. *See e.g., Brinkley,* 180 F.3d at 608 (explaining that to be probative of discrimination, there must be some relation between discriminatory remarks and the challenged employment action; stray or isolated remarks are insufficient).

Plaintiff, who is African American, was replaced by another African American. This fact, except in rare instances not applicable here, is fatal to his prima facie case of discriminatory discharge, and he thus fails to raise an inference that his discharge was based on his race. He also fails to rebut Defendants' legitimate, nondiscriminatory reasons for his discharge.

## IV. Conclusion

For the foregoing reasons, the court shall GRANT Defendants' motion for summary judgment.